SPAULDING et al. v. EVENSON et al.

(Circuit Court, E. D. Washington.    August 6, 1906.)

1. INJUNCTION—MOTION FOR PRELIMINARY INJUNCTION—AMENDMENT OF BILL.
    An amendment to a bill offered by a complainant on the hearing of a
    motion for a preliminary injunction, where no answer has been filed and
    complainant has the right to amend as of course, will be accepted and
    considered as a part of the application for injunction; especially where
    it relates to a formal matter not affecting the merits.

    [Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Injunction, § 316.]

2. COURTS—JURISDICTION OF FEDERAL COURT—AMOUNT IN DISPUTE.
    A bill in a federal court for an injunction to restrain defendants from
    interfering with complainant's business, which alleges that the value
    of the matter in dispute exceeds, exclusive of interest and costs, the
    sum of $25,000, and that complainant has been damaged by the acts
    of defendants in more than such sum, is sufficient, in the absence of any
    denial of such averments, to sustain the jurisdiction of the court.

3. PARTIES—VOLUNTARY ASSOCIATIONS—PARTIES BY REPRESENTATION.
    Where a voluntary association, with many members, is represented
    by a committee or regularly, constituted officers, a suit may be main-
    tained against such officers or members of the committee in their rep-
    resentative capacity, and in such case the association will be deemed be-
    fore the court without bringing in all of the members.

4. ASSOCIATIONS—LIABILITY OF MEMBERS—ACTS OF SUBSIDIARY ASSOCIATION.
    Where a voluntary association creates a subsidiary or branch associa-
    tion as an instrumentality through which to accomplish certain pur-
    poses, it is liable for the acts of such subsidiary association to the
    same extent as though such acts had been done by the entire member-
    ship.

5. INJUNCTION—GROUNDS—UNLAWFUL INTERFERENCE WITH COMPLAINANT'S
    BUSINESS.
    Defendant, which was a voluntary association, composed of numerous
    firms and corporations doing business throughout eastern Washington,
    some of whom were dealers in crockery, some in vehicles, some in
    stoves and ranges, and others in hardware, organized a subsidiary as-
    sociation, known as the "Peddlers' Association," and contributed funds
    to be used for the purpose of "competing with the peddlers." It was
    made the duty of every resident agent, upon learning of a peddler of
    ranges or vehicles offering to sell in his community, to immediately
    "offer him competition" by taking goods of like kind and quality, or
    catalogues of such goods, "together with teams and sufficient men to do
    so successfully, and accompany the peddlers on their rounds," and to ex-
    plain to farmers and others who might buy that they could do better
    with local dealers; giving them the privilege of buying from any dealer
    in the community.    Complainant was a manufacturer of wagons and
    buggies in another state, some of which were shipped to Washington,
    and there sold by agents, who took a number of vehicles, and drove
    through the country, selling them to farmers, and had thus built up
    a profitable business.    Defendant, in pursuance of its said scheme, through
    its officers and committee, employed two men to follow each of com-
    plainant's agents.    They stopped at the same hotels and stables, started
    out when he started, followed him to every prospective customer, and
    interfered with the conversation.    Some carried guns and revolvers.
    *Held,* that such acts were not competition, nor intended as such, but
    to suppress competition by destroying complainant's lawful business;
    that they were done pursuant to an unlawful conspiracy between per-
    sons, some of whom were not even competitors, to interfere with com-

plainant's lawful right to carry on its business, and their continuance would be enjoined.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Injunction, §§ 108, 170, 172.]

In Equity. On motion for preliminary injunction.

H. H. Stipp and Post, Avery & Higgins, for complainants.
Merritt, Oswold & Merritt, for defendants.

WHITSON, District Judge. In this case a temporary restraining order was issued without notice, upon the bill of complaint and the affidavits of several of the employés of complainants, and the defendants were cited to show cause why an injunction pendente lite should not be granted. The allegations of the bill are in substance as follows: Complainants are residents and citizens of the state of Iowa. They are and have been engaged in that state in the manufacture of buggies and wagons of various kinds for many years, which they have been selling, not only in the state of Iowa, but in various other states, including the state of Washington. Their method of making sales in this state is by means of salesmen traveling through the country, selling to farmers and others residing in the rural districts; that their vehicles, known as the "Spaulding buggies and wagons," are strong, and specially adapted to the needs of the farmers, and they have acquired a reputation in the state of Washington, and especially in eastern Washington, as buggies and wagons of high grade, purchasable at reasonable prices, and that the standing of complainants in said community and their said business is of very great value. It is alleged that the defendant the Inland Empire Implement & Hardware Dealers' Association is an association composed of local dealers, some of whom are dealers in hardware, and not engaged in the business of selling buggies and wagons or farm implements, while other members of the association are so engaged; that the membership of the association is composed of numerous firms and corporations of various counties in eastern Washington; that said association has raised a fund of $10,000, and placed it in the hands of defendant Evenson, to be used for the purpose of preventing complainants selling buggies and wagons in eastern Washington, and for several weeks last past complainants have had about 20 employés so engaged; that the method adopted by complainants is to drive through the rural districts, hauling from two to four vehicles, and stopping at farmhouses where customers may probably be found, and offering the same for sale; that all of the vehicles so offered are manufactured in the state of Iowa, and shipped to this state in car-load lots, and that before any of said buggies and wagons are offered for sale complainants pay the taxes thereon, and comply in all respects with the laws of the state of Washington; that the defendant the Inland Empire Implement & Hardware Dealers' Association, through the defendants Lucas, Evenson, and Hay, has, in pursuance of the policy of the association, and in accordance with the instructions of the membership thereof, unlawfully and maliciously interfered with the complainants' business, and have threatened, intimidated, harassed, and annoyed complainants' employés and the persons with whom complainants were transacting business, and inter-

fered with their liberty and the rights of complainants to make a livelihood, and to contract and to do business, in the following particulars: That they have various of the employés of complainants followed by employés of the defendants day and night, so that wherever one of the complainants' employés goes he is "dogged," sometimes by one, but generally by two, of the employés of the association; that some of said followers are armed with guns and rifles, some being unarmed; that whenever employés of the complainants undertake to converse with a farmer or other purchaser, such conversation will be interrupted by such followers, who undertake to persuade the probable purchaser from purchasing from agents of complainants, suggesting that they ought to purchase of resident dealers, who reside in the community; that such persons following are not undertaking to sell any buggies themselves, nor do they name or represent any competitor or dealer in buggies or wagons, their sole object being to prevent complainants from making sales, to the end that they may be driven out of business in the state of Washington; that after contracts of sale have been made between an agent of the complainants and purchasers, the agents of the defendants persuade such purchasers to violate such contracts and to refuse to consummate such sales; that several of such followers, at the instance of defendants, have been appointed deputy sheriffs, and that one of the agents of complainants has been arrested under the false and malicious charge of peddling goods without a license by a person so appointed at the instance of the defendants, and in furtherance of such conspiracy; that such conduct has been carried on for several weeks, and numerous sales have been lost; that employés of complainants have become alarmed and discouraged, and will, if such acts continue, quit the employ of complainants, and they will be unable to carry on their business; that in one instance a fist fight occurred between the salesmen of the complainants and persons so following them, and that further breaches will result; that in pursuance of their scheme the defendants have circulated false and slanderous matter regarding complainants' buggies, by newspaper articles and otherwise, and have circulated stories that complainants are perpetrating a fraud upon their customers—all of which, it is alleged, is done for the purpose of running the complainants out of business in the state of Washington.

The allegations of the bill are not wholly sustained. As to how far the affidavits presented at the hearing do sustain the bill will appear in another part of this opinion, where the facts are discussed. The restraining order did not enjoin the defendants from publication of false reports in newspapers, as prayed, for the reason that complainants have an adequate remedy at law for that grievance, and because such conduct, if truly alleged, would not have the direct effect of preventing them from carrying on their business.

1. The first point made by defendants is that, in the absence of any threatened continuance of the acts complained of, only a cause of action at law has been stated. This contention is well made. During the argument, complainants offered an amendment, thereby supplying the allegations, the absence of which was suggested, but defendants, by their counsel, object to the filing of the same, upon the ground that the injunction must stand or fall by the original bill of complaint.

This would be a somewhat technical view. A refusal to consider the amendment, which, under the rules, complainants may file as of course, and to regard it as a part of the application for an injunction, would be an idle proceeding, for, if complainants are entitled to the relief which they seek at this time, the only result would be that of delay. Another application could immediately be made under the bill as amended, and if complainants are entitled to an injunction at all, they could have the aid of the court by an ex parte order, or by an application on notice. Inasmuch as the parties are before the court with full showing made both for and against the injunction, it will be inexpedient to send them out of court, only to be recalled for a new hearing upon the merits. To sustain the objection would be a fruitless victory for the defendants, of temporary and transient character. Particularly should the right to amend be recognized when the proposed amendment relates to a formal matter not affecting the merits of the controversy, and concerning which counsel have not been misled. The amendment, therefore, will be permitted, and considered as a part of the application.

2. The next point raised is that the jurisdictional amount does not affirmatively appear. It is alleged:

"That the value of the matter in dispute exceeds, exclusive of interest and costs, the sum of more than twenty-five thousand dollars, and that your orators have been damaged by the said acts and conduct of said defendants in excess of the sum of twenty-five thousand dollars."

No answer has been interposed, nor has any affidavit been filed or presented tending in any way to dispute or contradict these averments. Taking the bill as a whole, it must be concluded that the matter in dispute is complainants' right to do business and its damages for being deprived of that right. The complainants have made a prima facie case sufficient to sustain the jurisdiction, in the absence of any denial or showing to the contrary. Pennsylvania Co. v. Bay (C. C.) 138 Fed. 203; Wetmore v. Rymer, 169 U. S. 115, 18 Sup. Ct. 293, 42 L. Ed. 682; Maffet v. Quine (C. C.) 95 Fed. 199; Barry v. Edmunds, 116 U. S. 550, 6 Sup. Ct. 501, 29 L. Ed. 729.

3. Defendants' counsel have argued that a voluntary association, as the Inland Empire Implement & Hardware Dealers' Association is shown to be, cannot be made to respond by a suit against its officers, but that its members must be before the court. This is the general rule. It is subject to at least one exception. Where an association with many members is represented by a committee or regularly appointed officers, if such representatives be brought in, it will be deemed that the association, as such, is before the court. The rule applicable to this case is laid down by Foster's Fed. Prac. § 48, as follows:

"Similarly, where persons who are jointly liable are very numerous, some may be sued instead of all, provided that the manner in which they are sued and the fact that they are numerous are stated in the bill. Ordinarily, the complainant selects such of the class as he chooses to represent the rest. The persons thus selected may be a committee chosen by the rest of the class to act for them in the matters complained of, such as a reorganization committee of stockholders and bondholders, or the managing committee of a clearing house association."

It is alleged, and not denied, that defendant Lucas is president of the association, that defendant Evenson is the secretary and active manager, and that defendants Cook and Heath are employés and superintendents, of the work referred to in the bill. While the defendants have attempted to appear specially, they have, under rule 22, appeared generally. Mahr v. Union Pacific Ry. Co., 140 Fed. 921. We then have the case of the president of the association, the secretary, treasurer, and manager of it, who is confessedly directing the work, two superintendents in the field before the court, supplemented by a general appearance of the association itself, composed of about 166 firms in eastern Washington and northern Idaho, upon a general showing resisting the application for an injunction, and in effect justifying the acts complained of. Equity rule 48 provides:

"When the parties on either side are very numerous, and cannot, without manifest inconvenience and oppressive delays in the suit, be all brought before it, the court in its discretion may dispense with making all of them parties, and may proceed in the suit, having sufficient parties before it to represent all the adverse interests of the plaintiffs and the defendants in the suit properly before it. But in such cases the decree shall be without prejudice to the rights and claims of all the absent parties."

It would seem that this rule is only declaratory of a well-established principle of equitable procedure which is generally recognized. McArthur v. Scott, 113 U. S. 391, 5 Sup. Ct. 652, 28 L. Ed. 1015; United States v. Coal Dealers' Ass'n (C. C.) 85 Fed. 252; Van Houten v. Pine, 36 N. J. Eq. 133; Pearson v. Anderberg (Utah) 80 Pac. 308; Fitzpatrick v. Ruter (Ill.) 43 N. E. 392; West v. Randall et al., Fed. Cas. No. 17,424, Vol. 29, 718.

The court has jurisdiction over the association as such, and over all parties who have appeared to resist the application for an injunction. In this connection it is proper to consider the contention that the defendant the Inland Empire Implement & Hardware Dealers' Association has not committed the acts complained of, but that the acts were committed by an association known as the "Peddlers' Association." It is disclosed by the affidavit of Edward W. Evenson, secretary of the Hardware Dealers' Association, that at a meeting thereof held at the city of Spokane on the 6th and 7th days of June, 1906, certain proceedings were had with reference to competition with peddlers, "who would, might, or should peddle goods and merchandise handled and sold by the members of said association, and in competition with the dealers in said goods and merchandise in the territory where the members of said association were doing business." The matter was fully discussed, and a committee was appointed to "formulate some plan of competing with the peddlers," which reported, recommending:

"First. The formation of an association, to be called the 'Peddlers' Association.' Second. That each and every resident dealer in either ranges or vehicles holding membership in the Inland Empire Implement & Hardware Dealers' Association be asked to pay into the treasury of such association the sum of twenty dollars ($20), or such other sum as said resident dealers may see fit; said payment being the only requirement as to membership. Third. That all manufacturers and jobbers in steel ranges and vehicles in the territory, or who solicit trade in the territory, be asked to contribute the

sum of one hundred dollars ($100), or such sum as they may see fit. Fourth. That all sums so collected be used to pay expenses incurred in offering to peddlers such competition as will enable resident dealers to hold their trade in such lines as may be peddled in their respective communities. Fifth. That whenever a resident agent shall know of a peddler of ranges or vehicles offering to sell goods in his community, he shall immediately offer him competition by taking goods of like kind and quality, or catalogues of such goods, together with teams and sufficient men to do so successfully, and accompany the peddlers on their rounds with the farmers and others who might buy, and explain to the farmers and others that they can buy goods of like kind and quality from them for less money, or better goods for the same money. In case such farmers should prefer not to buy from any particular dealer in the community, he can have the privilege of buying from any dealer in the community nearest and most agreeable to the farmer. Sixth. That the proceeds or profits of all sales so made shall revert to the Peddlers' Association, and that all expenses so incurred shall be borne by the Peddlers' Association. Seventh. That all funds on hand and all profits accruing shall ultimately be returned to the members pro rata. Eighth. That a committee of three be appointed, to be called a 'Peddlers' Committee,' whose duty it shall be to devise ways and means and to administer the funds collected for the above purpose, and also that the funds belonging to the Peddlers' Association be deposited in the Spokane & Eastern Trust Company in the name of A. Urbahn, chairman, and E. W. Evenson, who shall alone have power to draw the said funds for the purpose referred to. Ninth. All accounts to be accompanied by vouchers, and passed upon by the committee."

This report was adopted.

If anything more were needed to designate this proceeding of the so-called "Peddlers' Association" as the creation of and instrumentality used by the defendant association, it may be found in the affidavit of Evenson in reference to the Peddlers' Association, where he says:

"That for such reasons the branch of the defendant association known as the 'Peddlers' Association' was organized as hereinabove shown, and that, as shown by the objects and purposes as hereinbefore stated, the only reason, object, or purpose for the organization of said branch of said association was to enter into honorable, lawful, legal, and fair competition with said peddlers, to the end that the business of the members of said association might and would be protected from the invasion of the temporary peddlers, who might invade the territory of the members of the said association."

4. Saving the question of jurisdiction, the matters of practice thus far noticed are of comparatively minor importance. The vital question is whether an unlawful combination has been entered into, and through that combination the complainants are being wrongfully deprived of their right to carry on business within this state. The defendants do not claim that they are regularly engaged in the business of peddling. On the contrary, they lay stress on the fact that they have established places of business, residences, and local habitations, that they are citizens of the state, that they pay taxes, and submit to the burdens imposed by our laws, and that they thereby contribute to the upbuilding of the communities in which they respectively live, while the complainants are residents of another state, who, without bearing the burdens of citizenship, reap the benefits of a trade to which the defendants are justly entitled. However just, in the abstract, this contention may be, the rights of the parties are to be measured by the laws of the country. A nonresident of the state has the same right to do business within the state as a resident, and it is the duty of the courts to uphold that right wherever it is invaded by unlawful means. The

purpose of the association is disclosed in the fifth paragraph, which has been quoted in full. It is said: "That whenever a resident agent shall know of a peddler of ranges or vehicles offering to sell goods in the community," he shall immediately take goods of like character, and go in pursuit, etc. It will be noted that the dealer, whose expenses are paid by the association, does not confine himself to competition with his own goods. It is provided:

"In case such farmers should prefer not to buy from any particular dealer in the community, he can have the privilege of buying from any dealer in the community nearest and most agreeable to the farmer."

The effect of this is to conspire against the carrying on of a legitimate business. In the competition which the particular agent carries on, if he cannot sell his own goods, the inference is that he is to try to sell the goods of some other dealer; anybody's goods rather than to allow the peddler to sell. That this is the construction given by members of the association is shown by the affidavit of defendant Hay. In referring to the instructions given men sent out to follow peddlers by M. E. & E. T. Hay, a corporation, of which he is president, he says:

"That said employés were further instructed that, in case they found a prospective purchaser who for any reason did not wish to deal with the above-mentioned corporation, they should try to induce him to purchase from the local dealer to whom he was most favorably inclined and to whom he preferred to give his trade."

The association is not the owner of any vehicles, ranges, or other property. It is not engaged in mercantile pursuits. It cannot, therefore, become a competitor with those who are so engaged. It is not seeking to compete with those engaged in business, for it is not so engaged itself. It is a combination to interfere with, obstruct, and hinder the carrying on of business by persons engaged therein, without having any direct interest in like business, or any business whatever. This is not competition. Again, it is shown that the association is composed of numerous partnership firms and corporations, some of whom are engaged in the hardware business, others in the crockery business, some in the selling of stoves and ranges, but all of whom undertake to stand together, and contribute to the maintenance of a fund for the putting of peddlers out of business, whether such peddlers are engaged in competition with the line of goods which they handle or not. For instance, what justification can a dealer in crockery find for contributing to a fund with which to compete with the complainants, who are only dealers in vehicles? And what justification can one who does not deal in vehicles at all find for competing with the complainants, who confine themselves to that line alone? Can it be said that these firms or corporations, as the case may be, are competing with the complainants when they are not engaged in the sale of like commodities? Under our competitive system, one dealer may, if he can, put his competitor out of business, but he must do it through well-recognized methods of competition, namely, by offering better goods or better facilities, or selling at lower prices. But this rule applies to a competitor—one engaged in the same line of business. Whenever one not so engaged commits such acts as would be competi-

tion were the person engaged in like business, then it becomes an unwarranted interference, and the law will imply malice. According to the confessed purposes of the organization, the defendant association is organized for an unlawful purpose. Its members are committed by agreement, actually being carried out, to interfere with the sale of goods by what they term competition when not engaged in the same line, and the sale of which could not affect their interests, directly or indirectly.

5. The defendants contend that they have a right to follow complainants' agents, and to offer for sale goods in competition with them, and that they may interfere with any conversation and disturb any sale being made so long as they do not resort to violence, but admit that if the evidence shows that they are doing it for the purpose of putting complainants out of business, that it is a violation of the law, and the writ should go. The argument is this: One person has the same right to travel the public highways as another. If the farmer does not object, one has as much right as another to enter upon his premises and solicit his trade; that while it may be a breach of good manners to interfere with a conversation being carried on between the salesmen of complainants and salesmen of defendants, it is not an invasion of any legal right. In the abstract, if applied to a single instance, this contention is sound. If the canvassers of the defendants had occasionally fallen in with complainants' canvassers, and interfered with sales by competition in good faith, there could be no prevention of such conduct by an injunction. The real purpose of the organization, both as professed in its proceedings and as shown by the manner of carrying out that purpose, is not to promote or engage in competition, but to destroy it. A brief review of the history of this subject will throw light upon the present inquiry. In 1903 an act was passed by the Legislature of this state (Sess. Laws 1903, p. 38, c. 34), which undertook to prohibit the sale of vehicles, stoves, ranges, pianos, or other merchandise without a license, and the license fee was fixed at $10 per day, but with the proviso that the act should not apply to any person selling any of said articles from his regularly maintained stock or established place of business, when such stock had been maintained in the county for a period of six months. This act was several times held discriminative and void by superior judges of the state of well-recognized ability, but did not, apparently, reach the Supreme Court; those decisions being generally acquiesced in. While it has been suggested by affidavit that complainants are carrying on business in violation of this law, it was not referred to in argument, and it may be assumed that counsel do not rely upon that point. In 1905 an act was passed to meet the objections to that of 1903 (Sess. Laws 1905, p. 372, c. 177). It provides that every person, firm, or corporation who peddles out after shipment to the state, canvasses, or sells by sample, etc., shall pay in advance an annual license tax of $200. This act was recently declared void by the state Supreme Court. Bacon v. Locke, Constable (Wash.) 83 Pac. 721. It is a matter of common notoriety that this legislation was enacted at the suggestion and for the benefit of local dealers. The amount fixed for license by the Legislature was intended to be prohibitive of competition by peddlers. Shortly after

the decision holding the act of 1905 unconstitutional, we find the dealers who had attempted to put the peddlers out of business by legislation resorting to the very ingenious scheme which has been here disclosed. It is proposed now to accomplish by subterfuge that which the courts of the state have repeatedly held cannot be done directly. While complainants were engaged in selling vehicles in various counties of this district in the manner of their choice, parties were organized, consisting of two persons in each, to follow their salesmen, which they did with remarkable persistence and pertinacity. "Whither thou goest I will go; and where thou lodgest, I will lodge," was the rule to which they steadfastly adhered. In one instance a deputy sheriff was appointed and sent out as one of the alleged salesmen of the defendants. The appointment of a deputy sheriff to follow complainants' salesmen and cause arrests under a void act is suggestive of more than competition. In two other instances rifles were carried by the agents of the defendants. It is said that these were carried for the purpose of shooting squirrels and coyotes. In the light of the showing made, this theory must be taken with a grain of allowance. Such conduct suggests force. Two persons in a party is not in keep- ing with ordinary business purposes. One of these followers carried a revolver. Clearly this was intended to intimidate. Complainants' agents could not escape from these men, who shadowed them continual- ly, who stopped where they stopped, traveled when they traveled, sought the same customer at the same time, interrupted conversations where sales were being attempted, either with offers of other goods, or dissuading probable purchasers. They stopped at the same hotels, put up at the same stables, went early or late, as the salesmen of com- plainants went, following in close proximity; all this, it is said, for the purpose of selling goods in competition. It is a well-known fact that business men do not ordinarily court the presence of a competitor. Business methods, discounts from catalogue prices, and the like, the merchant does not, as a rule, lay bare to his adversary. The affidavits filed by defendants to sustain their objection to the granting of an in- junction do not meet by frank disclosure the grievances complained of. They are evasive by their silence on vital points, and their failure to definitely meet the charges confirms the view already suggested con- cerning their objects and purposes.

In the light of what has been disclosed, and of the legislative and judicial history of this subject, it would be doing violence to the in- telligence of the defendants not to conclude that every member of the association in his heart knows that the object and purpose in view in this particular transaction is to run complainants out of the state.

Undoubtedly the defendants have a right to peddle. They have a right to peddle in the same territory where the complainants peddle. They have a right to show the superior quality of their own goods and the inferior quality of the complainants' goods. They have a right to canvass by catalogue or otherwise. Their grievance, so frankly disclosed, that since they are located within the state, and contribute to its governmental expenses, they ought not to be brought into com- petition with those who, if they contribute anything in the way of taxes, it must be of the most transient character and limited amount, has led

them into a misconception of their remedy. While the law guaranties to them the right to peddle and solicit orders in every lawful way, it guaranties the same right to the complainants, and they are entitled, as the defendants are, to pursue their business in their own way, without being harassed, intimidated, or followed. There is ample scope for business enterprise, when the complainants' agents appear in the community, by canvassing the territory generally. It is idle to say that where the agents of the association follow the agents of the complainants, dog their footsteps, go to the same place, solicit the same man at the same time, stop at the same hotel, follow the next morning, whether it be late or early, are following for business rivalry only. The purpose of this harassment is to prevent the complainants from doing business; that it will accomplish it if it be permitted to proceed, cannot be doubted. If men cannot be protected under the law, they are apt to resort to violence, regardless of the law. Refusal of the courts to afford protection to legal rights leads to anarchy. A man's right to carry on his business is his property, and he can only lawfully be deprived of it by lagging behind his competitors, or by failure to keep abreast of them in the quality of his goods and the price he sells them for. He cannot be denied the right to do business upon equal terms with others. If, having equal opportunity, he fail, well and good. The fittest will survive. But every citizen is entitled to a chance equal to that of his fellow citizens. If an injunction be refused, the complainants are relegated to one of two courses. They must either give up their business altogether, which will accomplish the purpose the defendants have in view, or meet interference with violence. It is shocking to suppose that a citizen engaged in a lawful undertaking can be compelled to accept either alternative.

Counsel for defendants have suggested that there is no law which is violated when the defendants' agents follow the complainants' salesmen. The interference with the complainants' rights consists in depriving them of the privilege of conducting their own business in their own way. One who violates no law in so doing is entitled to carry on a business according to his own ideas of propriety and expediency. Every man may follow his own occupation without hindrance. The principle which defendants would establish could, in this age of combinations and trusts, and in all probability would, come back to plague them. It is sufficient that the defendants have the legal right to engage in the occupation which the complainants engage in, and in the same way. They can fully protect themselves by canvassing the same territory. Locally it must be assumed that they would have the advantage in this regard. To follow the footsteps of complainants' salesmen, to interfere at every turn, is beyond endurance. To permit this to be done would be destructive of individual liberty, and it would strike at a sacred right, namely, that of allowing every citizen to pursue his own calling unobstructed and unhindered, except in so far as better goods, lower prices, better facilities, or the like, would have a tendency to hinder or obstruct.

Viewed according to the ordinary conception of right and wrong, one instinctively recoils from the contention of the defendants. There is no substantial conflict in the authorities applicable to facts such

as are here presented. A case of striking similarity in many respects to the one at bar is that of Standard Oil Co. v. Doyle, decided by the Supreme Court of Kentucky, and reported in 82 S. W. 271. Doyle had been in the employ of the Standard Oil Company at Lexington, but resigned his connection with that company, and entered into business as an independent dealer. He was quite successful, on account of his large acquaintance, and soon made great inroads on the business of his former employer. Thereupon the oil company sent one Bonnycastle, ostensibly "to look after the business interests of the Standard Oil Company in Kentucky by increasing its sales of oil, by making for it new customers, and, if possible, to regain the customers lost by reason of Doyle's connection with the Standard Oil Company having been severed." The company started wagons in opposition to Doyle's wagons, and followed such wagons, sometimes getting in front of them, and stopping at every place where Doyle's wagons stopped, sometimes going into a house where Doyle's men were, and there offering to sell oil at a cheaper rate, and in one or two instances cursing and abusing Doyle's drivers. Sometimes the company's drivers would stand for hours awaiting the movement of Doyle's drivers. The language of the court in its finding that there was a conspiracy is peculiarly applicable:

"It was most assuredly unlawful to obstruct, harass, and annoy appellee's employés when engaged in the discharge of their duties in selling and distributing oils to appellee's customers; to threaten customers of appellee to shut them up in their business if they continued to deal in appellee's oils; to cause and procure false and injurious reports concerning appellee and his business to be circulated in Lexington and vicinity; and to procure appellee's arrest and prosecution on false charges in connection with the business in the sale of oils, for the purpose of estranging and alienating the acquaintances, customers, and patrons of appellee."

In sustaining a judgment for damages obtained in the lower court, it was said:

"While the evidence was conflicting upon all the questions at issue, and especially upon the issue of conspiracy, yet we were of the opinion that there was sufficient evidence upon that point to authorize a submission to the jury. A conspiracy is a combination between two or more persons by concerted action to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means. It is shown by the evidence that a purpose was accomplished by unlawful means, and when we consider the relation of the parties, their manifest motives of self-interest, the manner in which the purpose was carried out, and the declarations of the parties, it is reasonable to infer that this purpose was accomplished by concert of action and agreement of appellants."

In Drake Hardware Co. v. Wrought Iron Range Co. (Sup.) 78 N. Y. Supp. 1114, an order in the following language was approved:

"It is hereby ordered that said defendant, * * * its agents, etc., * * * be, and they are hereby, restrained, prohibited, and enjoined * * * from preceding or following in close range any employés, team, or teams of plaintiff with employé's team or teams in such manner as to hinder, obstruct, harass, or intimidate plaintiff and its employés in the free use of the highway, and from in any other way occupying said highway in such manner as to hinder, obstruct, harass, or intimidate plaintiff and its employés in the free use thereof; * * * from resorting to any species of threats, intimidation, force, or fraud, or any conduct which would imply threats, intimidation, coercion, or force, for the purpose of preventing plaintiff from selling

its stoves.and· ranges· and carrying on its business * * * of: selling from wagons."

The foregoing cases are directly in point òn the facts, but the following sustain the principle for which complainants contend: Bohn Mfg. Co. v. N. W. Lumbermen's Ass'n (Minn.) 55 N. W. 1119, 21 L. R. A. 337, 40 Am. St. Rep. 319; State ex rel. Durner v. Huegin (Wis.) 85 N. W. 1047; Loewe et al. v. Cal. St. Federation (C. C.) 139 Fed. 71; Jensen v. Cooks' & Waiters' Union (Wash.) 81 Pac. 1069; Seattle Brewing & Malting Co. v. Hanson (C. C.) 144 Fed. 1012; W. Va. Transportation Co. v. Standard Oil Co. (W. Va.) 40 S. E. 591, 56 L. R. A. 804, 88 Am. St. Rep. 895; Van Horn v. Van Horn (N. J. Err. & App.) 28 Atl. 670; Bar v. Essex Trades Council (N. J. Ch.) 30 Atl. 881; Eddy on Combinations, § 262.

An injunction ·will be granted prohibiting the defendant association as such, and all defendants who have appeared in the action, from following, harassing, intimidating, or interfering with the business of complainants, from approaching persons solicited by complainants at the same time complainants' agents are ·soliciting them. This will not be construed as prohibiting defendants from canvassing and soliciting customers or peddling in the same territory and at the same time that complainants' agents are canvassing, soliciting, or peddling. The injunction to go into effect upon the filing of a good and sufficient bond, to be approved by the clerk of the court, in the sum of $8,000, with appropriate conditions, indemnifying the defendants against loss, damages, and costs.