### GOLDFIELD CONSOL. MINES CO. v. GOLDFIELD MINERS' UNION NO. 220 et al.

(Circuit Court, D. Nevada. March 7, 1908.)

No. 1,020.

1. INJUNCTION—GROUNDS AND SCOPE.

    An injunction pendente lite should not usurp the place of a final decree, neither should it reach out any further than is absolutely necessary to protect the rights of property of the complainant from injuries which are not only irreparable, but which may be expected before the suit can be heard on its merits. It is not necessary that the complainant's rights be clearly established, but it is sufficient if it appears that there is a real and substantial question between the parties proper to be investigated in a court of equity, and that in order to prevent irremediable injury to the complainant before his claims can be investigated, it is necessary to prohibit any change in the conditions and relations of the property and of the parties during the litigation.

    [Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Injunction, § 302.]

2. SAME—SUBJECTS OF PROTECTION AND RELIEF—RIGHT TO OPERATE MINE.

The right to operate a mine and to carry on the business of mining therein is a property right whether one owns the mine or not, and he may invoke the powers of a court of equity to protect such right, in a proper case, even though he is not the owner of the mine, or even a stockholder in the company which does own it.

3. CONSTITUTIONAL LAW—LIBERTY TO CONTRACT—VALIDITY OF STATE STATUTE.

Laws Nev. 1903, p. 207, c. 111, § 1, which provides that "it shall be unlawful for any person, firm or corporation to make or enter into any agreement, either oral or in writing by the terms of which any employé of such person, firm or corporation, or any person about to enter the employ of such person, firm or corporation, as a condition for continuing or obtaining such employment shall promise or agree not to become or continue a member of a labor organization, or shall promise or agree to become or continue a member of a labor organization," deprives the employer of the liberty to contract as to matters which may be vital to him, and therefore is invalid under the constitutional provision that "no one shall be deprived of life, liberty or property without due process of law."

4. CONTRACTS—LEGALITY—AGREEMENT BETWEEN MINE OWNERS NOT TO EMPLOY MEMBERS OF LABOR ORGANIZATION.

An agreement between mine operators that they will not employ any person who belongs to a certain labor organization, or to any organization affiliating therewith, does not constitute an unlawful conspiracy against such organization or its members.

5. "CONSPIRACY"—WHAT CONSTITUTES.

An unlawful "conspiracy" is a combination between two or more persons to do an unlawful or criminal act, or to do a lawful act by criminal or unlawful means.

[Ed Note.—For cases in point, see Cent. Dig. vol. 10, Conspiracy, §§ 1–5.

For other definitions, see Words and Phrases, vol 2, pp. 1454–1461; vol. 8, p. 7613.]

6. INJUNCTION—PERSONAL RIGHTS—INTERFERENCE WITH OCCUPATION—UNIONS.

Workmen, when free from contract obligations, have a legal right, singly, collectively, or as a union, to quit work—that is, to strike—and they have the further right to use such lawful means to make the strike effective as are not inconsistent with the rights of others, and they may endeavor by peaceful argument and persuasion to secure the co-operation of any nonunion men, provided the persuasion is of such a character as to leave the person solicited free to do as he pleases, and he is not persuaded to do that which it would be unlawful for him to do

7. SAME—PICKETING.

Nonunion men have a right to seek employment, to come and go from their work, or to go where they please on the public thoroughfare, without molestation, threats, violence, or insults of any kind, and without being picketed or compelled against their will to listen to persuasion.

8. SAME.

Striking workmen, who assail nonunion men with threats, ridicule, or insult, or who follow them to or from their work with vile language and abusive epithets, in order to compel them to quit work, or to refrain from offering to work, are guilty of unlawful conduct.

9. SAME.

Picketing, if confined strictly and in good faith to gaining information and to peaceful persuasion and argument, is not forbidden by law; but when it is used for purposes of intimidation it is unlawful. The massing of unnecessary numbers of pickets at a point which must be passed by nonunion men, whom the strikers desire to influence, is in itself an act of intimidation.

**10. SAME.**

Any attempt to intimidate a man in order to compel him to refrain from exercising a legal right is unlawful.

**11. SAME.**

If, after the miners' union became aware of the fact that the pickets were carrying out a common purpose to intimidate nonunion men in order to compel them to quit work, it still continued to co-operate with and supervise the pickets, it must be held that there was an agreement between the union and the pickets to do an unlawful act.

**12. SAME—EVIDENCE—SUFFICIENCY.**

Defendant, a miners' union, declared a strike against complainant, which was a mining company, and appointed a committee, with full power to regulate the conduct of the strike. With the knowledge and acquiescence of such committee, if not by its orders, members of the union, to the number of from 30 to 75, or more, gathered each time shifts were changed at complainant's mine, where its employés were compelled to pass, and there was evidence tending to show that they followed such employés, and used abusive and threatening language towards them. It was also shown that complainant was unable to obtain sufficient men because of their fear of the strikers, and that it employed 50 guards at an expense of $250 per day to protect its property and workmen. It also appeared, from the constitution of the union and from its prior acts, that it was dominated by men who were not inclined to cultivate friendly relations with employers, but rather to promote strife. *Held*, that such evidence was sufficient to show a conspiracy to subject complainant to unlawful picketing and interference with its business and property by intimidating its workmen, which the union either originated or became a party to, and which entitled complainant to relief by injunction against the union and its members.

**13. SAME.**

An important element to be considered in determining whether injurious conduct is to be apprehended from a labor union during a strike, which ought to be restrained by injunction, is the character of the dominant faction in such union.

## In Equity. On motion for preliminary injunction.

Complainant, a Wyoming corporation, owns mines in the Goldfield Mining District, and also owns about 97 per cent. of the capital stock of the Goldfield Mohawk Mining Company, Red Top Mining Company, Goldfield Mining Company, and Laguna Goldfield Mining Company. It operates all of its own mines, as well as the mines of said companies, as one property for the use and benefit of itself and other stockholders. It appears from the bill of complaint that the Goldfield Miners' Union No. 220 is an unincorporated association composed of the individual respondents named, and from 1,500 to 2,000 other persons in Goldfield, all of whom are residents of Nevada. It is a branch of the Western Federation of Miners, also a voluntary, unincorporated association.

It is alleged that the Goldfield Miners' Union, though claiming to be a labor organization, is a criminal society, organized to agitate certain so-called political questions, which tend to subvert the general principles of government, and, for the purpose of carrying out its conspiracy, it has, as one of its cardinal principles, that there shall be a continuous state of warfare between its employers and employés; that it is the duty of the employés to take the property of the employers by stealth and force, and if the demands of the employés are not complied with, to destroy the property of the employers; that it seeks to accomplish its purpose by making unreasonable demands upon complainant, and enforcing the same by threats, boycotts, intimidations, picketing, brutal assaults, deportations, and other similar methods; that in the past two years the union has at Goldfield declared a large number of strikes, to enforce which it has resorted to every form of lawless violence, even to murder and wanton destruction of property; that each of these strikes

was a conspiracy on the part of respondents to prevent complainant from working its mines, and shipping its ores to other states, unless it agree to the terms announced by said respondents, in consequence of which complainant's mines have been idle more than one-quarter of the time, and such a threatening condition of disorder was produced that it became necessary in December, 1907, to bring federal troops to Goldfield in order to maintain public peace and safety; that since December 12th the respondents have caused complainant's properties to be picketed; that is, a large number of men belonging to Goldfield Miners' Union No. 220 have kept constant watch upon complainant's property, unlawfully invaded the same, endeavored to prevent employés from working for complainant, and threatened them with bodily harm, death, or deportation if they continued to work. It is further alleged that complainant pays higher wages than are ordinarily paid in Western mining camps; that it is unable to secure a sufficient number of men to operate its works by reason of the unlawful conduct of respondents; that it can obtain hundreds of men who are ready and willing to work if assured adequate protection; that the pickets and trespasses have increased in number; the threats and intimidations have increased day by day since the picketing was first established, and that the property of complainant will be destroyed in whole or in part unless some order is made by this court to protect the same. By reason of respondents' unlawful conspiracy complainant has been put to an expense of over $10,000 by the shutting down of its mines, guarding its property, and bringing men from other points; that such expense is increasing, and will continue to increase unless the court by some order protects complainant's property and employés. The bill further states that the union is a nuisance and an illegal body existing for the sole purpose of hampering complainant in the control of its business, and preventing interstate commerce; that it is a continual menace to complainant's business, and will, so long as it exists, prevent complainant from mining and shipping its ores, and cause hundreds of thousands of dollars damage to complainant's property; that the respondents are wholly irresponsible, and the union should be abated as a nuisance; that all said conspiracies are planned in meetings of the union, and if such meetings are permitted to continue the conspiracies will continue to be hatched, and the injury will be irreparable; that the shutting down of the mines has already caused drifts, stopes, and other workings in the mines to cave.

An injunction is asked restraining respondents from obstructing the operation of complainant's mines; from intimidating its employés; from congregating on and picketing its works; from maintaining an illegal boycott against the company, its agents or employés; and from holding or attending any meeting of the Goldfield Miners' Union. It is further asked that said Goldfield Miners' Union be prohibited from holding or calling any meeting of any kind in the Goldfield Mining District, or elsewhere.

To this bill a joint plea and answer was filed, in which it is alleged that complainant is violating the provisions of the Constitution of Wyoming against consolidations and combinations, to prevent competition; against forming corporations for holding stock in other corporations, and against monopolies. It is further averred that complainant in November, 1907, conspired with other corporations and millowners in Goldfield District, to oppress, boycott, and drive therefrom all laborers in and about the mines who would not accept the scale of wages and other conditions dictated by the members of such combination, in pursuance of which they adopted a reduced scale of wages and refused to employ any members of the Western Federation of Miners, or of the respondent union. It also avers that the present strike is due to the fact that the members of the union were unwilling to accept depreciated paper in lieu of money for wages. Respondents also deny that they have caused any depreciation in complainant's stock; that either the union or the Western Federation of Miners is a conspiracy, or that their principles or practices are unlawful; deny that they have made or enforced any demands by boycotts, threats, intimidation, picketing, brutal assaults, or deportation, or that they have resorted to any form of lawlessness or violence in the Goldfield Mining District. It is alleged that the bringing of the federal troops to Nevada was unnecessary, and was brought about by complainant

and others in pursuance of the above-mentioned conspiracy; deny that the union ever caused complainant's property to be picketed, or has adopted a system of picketing in said strike, except that divers members of the union, voluntarily and without preconcert, and without any special direction of the union, have gone into the neighborhood of complainant's property, and addressed lawful arguments to any nonunion man willing to listen; deny any unlawful picketing or trespass on complainant's property, or that respondents have caused, or will by any unlawful acts or conduct cause, complainant any loss or expense, or that any order of this court is necessary to protect complainant's property or employés, or that respondents are unable to respond in damages, or that the union is a nuisance, or an unlawful or illegal body, or that it has been, or is, an unlawful menace to complainant's business; and, in general, denies all unlawful conspiracies and combinations charged in the bill.

In order to appreciate the present conditions in Goldfield it is necessary to review briefly the relations which have existed between the parties herein during the year preceding the commencement of the present trouble.

The affidavit of W. H. Bryant shows that the stealing of high grade ores by complainant's employés from mines operated by complainant has been a common practice, and that during the six months preceding December 31, 1907, not less than $1,000,000 worth of ore was so stolen from the Mohawk property alone. The statement has not been denied. This practice has been the source of much irritation. In December, 1906, in pursuance of an order and injunction of the federal court, watchers were sent to the Mohawk property to prevent the stealing of ore; thereupon the employés, "all of whom were under the jurisdiction of the respondent, Goldfield Miners' Union No. 220, refused to work below the surface where any of said watchers were stationed." The affidavit of E. S. Sheridan, one of these watchers, shows that he was waited on by a committee from said union consisting of Ted James, the present assistant secretary of the union, and John Devit, who remonstrated with him on the ground that no good union man would stand guard over the men. Sheridan refused to give up his position, and shortly after was expelled from the union. Later, the union demanded his discharge by the company on the ground that he had violated his obligations to the union. This was refused. December 20, 1906, a general labor strike was inaugurated by the union. Complainant's mines were shut down on this occasion 19 days. January 9, 1907, a settlement was reached; the wages of each employé were then raised about one dollar per day, and it was agreed that properly appointed change rooms should be erected at the mines; that any operator might at any time require all employés to use such change rooms in going on and off shift, and to change their outer garments; the change rooms were to be under the control of a watchman. The object of the change room was to check ore stealing or "high-grading." Early in March, 1907, trouble arose between the Goldfield Miners' Union No. 220 and the Carpenters' Union, affiliating with the American Federation of Labor, which resulted in a general effort by the members of the respondent union to induce all American Federation of Labor men to join the Miners' Union. The Miners' Union carpenters refused to work at any mine where carpenters, not members of their own union, were employed. March 7, 1907, in consequence of this friction, a delegate of the Miners' Union, without authority, called upon all members of the union working in the Mohawk mine to quit work on the ground that said mine was employing carpenters not members of the union. The men at once ceased work, but, on the same day, the Miners' Union repudiated the action of the delegate; the men returned and offered to work again, but the offer was refused, and complainant shut down all its mines until such time as the discordant labor unions could adjust their differences. About this time the following notice was served on complainant:

"Goldfield, Nevada, March 8th, 1907.

"Mr. John W. Finch, Nixon Building.

"Dear Sir: Goldfield Miners' Union No. 220, W. F. M., have passed a law that all workers employed around the mines must hold a membership card in this union, and if they do not join our members shall refuse to work. This

pertains principally to the carpenters. We demand that members of our organization only shall follow that work, and shall draw the same wages as men now following that line of work. This goes into effect at once."

On the 10th day of the same month, John Silva, a restaurant keeper in Goldfield, who had refused to conform to certain demands of the Miners' Union, was shot. M. R. Preston, then a walking delegate, and Joseph Smith, a member of the respondent union, were accused of the homicide. Later they were convicted in the district court of Esmeralda county, Nev.; Smith of manslaughter, and Preston of murder in the second degree. Both are now confined in the State Prison of Nevada. The respondent union went to the support of both Preston and Smith, furnished them with attorneys, and, since their conviction in the spring of 1907, and up to December 6th of the same year, paid them at first $5 per day, and later $50 per month. March 13, 1907, the Goldfield Business Men and Mine Owners' Association adopted and published certain resolutions, in which it was stated "that local conditions are becoming intolerable through constant and unreasonable agitation on the part of the leaders of an organization known as the I. W. W., and that an unchecked tendency of such conditions means danger to life and property and the ultimate destruction of mining and general business in the camp of Goldfield," and the members pledged themselves not to employ any member of the I. W. W. in any capacity, but to recognize any labor organization not affiliated with or under the jurisdiction of the I. W. W. The Goldfield Miners' Union being subsidiary to the Western Federation of Miners, and the Western Federation of Miners being the Mining Department of the I. W. W., the effect of these resolutions was such that no member of the Miners' Union could obtain employment in the Goldfield Mining District. During this trouble a large number of guards were employed to patrol the town of Goldfield and protect property therein. April 1, 1907, a settlement in the following terms was effected:

"In order to establish a definite understanding between the Western Federation of Miners, Local Union No. 220, and the mine owners and operators of the Goldfield Mining District, it is agreed that mining and milling operations will be resumed and continued under the following terms:

"1. The wage scale in effect in the district March 1, 1907, shall remain in force, and eight hours shall constitute a day's work for all men under the jurisdiction of the Miners' Union.

"2. The Miners' Union shall have jurisdiction over all men regularly employed in and around the mines, mills and smelters, including timbermen, timber-framers, engineers, blacksmiths and machinists, and excepting superintendents and managers.

"3. No strike or boycott shall be officially declared by the Miners' Union unless by a two-thirds vote of that organization in favor thereof, and no lockout shall be enforced by the mine owners and operators unless by a like vote.

"4. No town labor controversy shall interfere with the operation of the mines, or the employment of miners.

"5. These terms shall remain in force for a period of two years from date."

In June, 1907, the Western Federation of Miners at an annual convention held in Denver, Colo., amended its constitution in such a manner as to make it easier to strike, and harder to settle. Nothing appears, either in the amended constitution of the Western Federation of Miners, or in the constitution of the Goldfield Miners' Union, which recognizes any duty on the part of either organization to maintain good relations with its employers, or to arbitrate their differences. August 17th change rooms were put in operation at the Mohawk mine; the water furnished was impure, and the arrangements were such that each man after disrobing on one side of the change room was compelled to walk in his underclothes around a partition, a distance of about 100 feet, to the other side of the room. A strike was inaugurated immediately, which continued until September 6, 1907. A number of conferences between complainant and representatives of the union followed. Complainant insisted that the men should be "supplied with lockers or clothes hooks on opposite sides of the change room, on one side for mining clothes and on the other side for street clothes, and in effecting the change of clothing should

walk across the room, passing no intervening partition;" and that "besides the timekeeper stationed in the room, the mining company may, at its discretion, place among the men in each change room one or more watchmen, who are to be neutral." The Miners' Union insisted, first, that each miner be furnished a locker; second, that he change his outer clothes without leaving his locker; and, third, that No. 220 W. F. M. have jurisdiction over all men working in and around the mines and mills, irrespective of time of their employment or nature of work, except managers and superintendents. The strike was finally settled by the following agreement:

"It is agreed between Local Union No. 220 of the Western Federation of Miners and the Goldfield Consolidated Mines Company for itself and its constituent companies, that the wage scale and other terms of settlement made in January and April, 1907, between the mine owners and operators of the Goldfield Mining District and the said union shall remain in force and effect as between them, and that work will be resumed upon the following conditions:

"1. That all employés of the Goldfield Consolidated Mines Company, and of its constituent companies, when required will change their outer clothing when going on and ceasing work without any humiliation or undue exposure of the men and in the presence of the timekeeper of the company and one or more neutral watchmen to be appointed by the company. Each man shall be supplied with two lockers, one for his street clothes and one for his mining clothes, which lockers are to be adjoining one another and the keys to be given to the person using them. In using the lockers each man is to take off the clothes he is wearing, place them in one of the lockers and lock the same, then unlock the other locker and take out the clothes contained there and put them on and then lock that locker. In using the lockers no man shall be required to pass any intervening partition and no visitors shall be admitted to the change room while the men are changing clothes.

"2. That all men at work on the Goldfield Consolidated Mines Company properties and its constituent companies who walked out over change rooms be reinstated without discrimination, provided, the men present themselves for work within twenty-four hours after work is resumed.

"3. That Local Union No. 220, Western Federation of Miners have jurisdiction over all men regularly employed in and around all mines and mills owned and operated by the Goldfield Consolidated Mines Company, and its constituent companies, with the following exceptions: (a) Managers and superintendents; (b) assayers, chemists, and the men in charge of the furnace, parting and weighing rooms of assay department and of chemical laboratory; (c) mine surveyors and the civil and mining engineers; (d) watchmen; it being understood, however, that no party who for good cause is particularly obnoxious to the union shall be employed as a watchman; (e) employés of independent contractors engaged in the placing of machinery, delivery of supplies, erection of buildings, or other surface work not directly mining in its character, it being agreed, however, that the company will place in all such contracts and in bonds for the performance thereof, a clause binding the contractor to pay the customary and established wages of the Goldfield Mining District: to employ none but members of some recognized Labor Union and no discrimination to be made against members of the Western Federation of Miners; (f) any employé when the Western Federation of Miners is unable to furnish from its own ranks a person able to do such work.

"It is understood and agreed that any employé of any of the excepted classes enumerated may belong to the Western Federation of Miners if he so desires, and that organization will admit him and no discrimination will be made by the company against members of that organization in the employment of any of the excepted classes and any one belonging to the organization shall be subject to its juridiction."

About the last of October, 1907, the Goldfield Miners' Union refused to declare a sympathetic strike in aid of the Bishop Union against the Nevada Power Company; there was a majority vote in the union in favor of the strike, but not the necessary two-thirds. About November 14, 1907, complainant, claiming that it was unable on account of the financial stringency to obtain necessary gold to pay its employés, posted notices in Goldfield "to the effect that on and after that date, and until the financial stringency was relieved,

the employés of the company would be paid one-half in gold and one-half in cashier's checks issued by John S. Cook & Co., Bankers, of Goldfield, Nevada, and that this notice applied only to labor performed in the month of November, and later." Mr. MacKinnon, president of the Goldfield Miners' Union, says that on November 16th a further notice was posted to the effect that thereafter complainant's employés would be paid entirely in scrip. On the same day, November 16th, the union appointed a committee to confer with a committee of mine owners. The instructions to the committee were embodied in the following statement which was sent to the Mine Owners' Association:

"This meeting is called for the purpose of considering the best means of meeting the present financial crisis. Some of the mines are issuing checks in payment of wages to the men, with the words 'payable in exchange' written across the face of the checks. I believe that we want the mines to be operated: and at the same time the men must be paid so that they can use their pay without discount to procure the necessities of life. We realize that, until some method is put into action, money is hard to obtain. In order that this whole matter may be properly considered, I recommend that a committee of three be selected to confer with a committee of mine operators, and that said committee be empowered to assist in devising some way to meet the present crisis. That said committee co-operate with the mine operators in endeavoring to secure from the smelters and mills a concession that all bullion procured as a result of mining in Nevada be sent to the mint, and coin demanded therefor, and that said smelters and mills then pay for said ores in coin, and that the mine operators pay their men in coin as soon as this arrangement can be satisfactorily brought into operation. That in the meantime such method of payment be followed as will best enable the men to meet their current expense without loss. That where checks are issued 'payable in exchange' said committee have the mine operators' guarantee the payment of said checks, or exchange, and have a time limit fixed for the payment of same in cash, and that everything be done that is possible to put the business of Goldfield on a cash basis, and that all checks, or exchange, issued to the men for wages shall be the first ones paid in cash out of the produce of the mines."

A number of conferences were had, but the evidence is so conflicting that it would be difficult at this time to make a satisfactory statement as to what occurred at such meetings; however, the correspondence between the parties gives fairly, and with reasonable accuracy, the attitude of each. November 18th, the Mine Operators' Association addressed a communication to the union, the material portion of which is as follows:

"Resolved, that all the companies operating in the Goldfield Mining District pay all employés in bank checks, payable in exchange and suspend cash payment for labor; and that this form of payment go into effect on and after November 18, 1907, and continue in operation until the present financial crisis is passed and the local banks are able to obtain currency for funds and balances due them from corresponding banks and smelters."

November 22, 1907, the following letter was sent by the miners' committee to the operators' association:

"Goldfield, Nevada, November 23, 1907.

"To the Goldfield Operators' Association,
        "William M. Erb, Secretary.

"Sir: Your communication of recent date received, and the same with all other matters placed before the special meeting of Goldfield Miners' Union No. 220, November 22, 1907. How it was received is shown by the resolution passed unanimously by No. 220, which we here give you in full.

" 'Resolved, that the present committee be continued with instruction to notify the Mine Operators' Association that unless the wages of the mine employés of Goldfield are paid either in cash or in checks, backed by a guarantee satisfactory to the union committee, said employés will cease work on the mines at 7 o'clock Sunday morning, November 24, 1907.'

"You will see by this the working class in Goldfield wish to have some part in deciding what they shall accept as wages for work performed now and hereafter.

"We wish to call your attention to the fact that according to the terms of the resolution passed by the Union, it is absolutely necessary that your association shall give us a reply before tomorrow morning.

"Trusting the mine operators of Goldfield will see the justice of our position, and co-operate with us to avert trouble we remain, respectfully,

"John H. Gilbert,
"Michael Callahan,
"Marion W. Moor."

On the same day the mine operators replied as follows:

"Goldfield, Nevada, November 23, 1907.

"Goldfield Miners' Union No. 220, Goldfield, Nevada.

"Gentlemen: Your communication of November 23rd signed by your committee addressed to the Goldfield Mine Operators' Association has been considered, and in reply the Goldfield Mine Operators' Association wish to state that after a reconsideration of the question in issue with your committee, the Goldfield Mine Operators' Association offers the following facts in explanation of its communication of the 18th day of November:

"The Goldfield Mine Operators' Association cannot offer a guarantee in addition to that offered by the local banks for cashiers' checks issued by the local banks.

"The Goldfield Mine Operators' Association cannot place the ore shipped from the Goldfield District as a guarantee for cashiers' checks issued by the local banks for the reason that more than eighty per cent. of the ore shipped is sent out by the local banks and the returns from these shipments are made direct to the local banks. The local banks do not issue cashiers' checks except against collateral or ore shipped from the camp, and no operator can possibly issue checks for amounts unless secured by camp products.

"The local bank will not extend credit to any operator without collateral which is negotiable into cash.

"Yours very truly,        Goldfield Mine Operators' Association,
"By Wm. M. Erb, Secretary."

On the evening of November 26th, at a meeting of the respondent union, the following resolution was adopted:

"That members of this union cease working for all employers that do not pay cash or secure their paper to the satisfaction of this union. Carried unanimously."

The members of the union ceased work November 27, 1907.

The cashiers' checks referred to in this correspondence were in the following form:

"John S. Cook & Co., Bankers.
"Goldfield, Nevada, Dec. 7, 1907.
"Pay to the order of I. J. Gay, Asst. Cashier.
(Payable in Exchange.)        $1.
....................One................Dollars.
"Cashier's check.        Jno. S. Cook,
"Cashier."

"Endorsed: I. J. Gay,
"Assistant Cashier.
"No further endorsement required."

Mr. MacKinnon thus states the position of the union with reference to these checks:

"We were in this boat, when we accepted a check in payment from any mine, consolidated or other, that had written on that check 'Payable in Exchange,' we had to take that check to the bank and accept John S. Cook & Company's scrip, which had no backing whatever that they would show us, * * * and it was taking away from us all possibility of getting back from the company any money in case of failure of the bank, and it was a questionable institution at that time, as to its ability. * * * The very fact that two banks had closed their doors, and the fact that John S. Cook & Compa-

ny's bank had a run on it, and the further fact that to meet a deposit of five million dollars or more, that all the wealth that it could acquire among its friends or banks, was nine hundred thousand dollars, was evidence in itself that the bank was not solvent."

Complainant claims that the strike of November 27th is in violation of the April agreement, and that the majority of the miners were not only opposed to the strike, but were willing to continue work, and to receive their pay in cashiers' checks. This claim is supported by affidavits of persons who state that they had talked with the miners. The testimony of Mr. MacKinnon, and other respondents, shows that the meeting at which the strike was declared was held after due notice; the Miners' Union Hall was full at the time, there being not less than 700 persons present; the vote was taken by uplifted hands; there were more than 500 in favor, and but 1 against, declaring a strike; the meeting was participated in by all members who customarily attend meetings of the union, and 95 per cent. of those present were miners. Mr. MacKinnon further testifies that there were not more than 1,200 members of the union employed, and 700 or 800 unemployed, in the district on the 1st day of August, and of the total, about three-fourths were miners; the remainder were town workers.

Federal troops were brought to Goldfield December 6, 1907, three days before the Mine Owners' Association, including complainant, gave public notice of a reduction of wages and of their refusal to employ members of the Goldfield Miners' Union. The Special Commission appointed and sent by the President of the United States in December, 1907, to Goldfield to investigate conditions there, rendered a report upon which the President acted, and the recommendations of which he adopted. The report was admitted in evidence, and from it the following quotation is made:

"The question as to possible future violence and disorder on the withdrawal of the troops we find to depend largely on the personnel of the Miners' Union and their leaders in particular. A number of these leaders are represented to be men of radical socialistic beliefs and in favor of forcibly asserting what they hold to be their rights. Goldfield, being one of the newest and richest gold mining camps of the West, attracted many of the most adventurous and radical characters in the Miners' Union, and while many of these have recently left, it is believed that there remain a considerable number of men whose records in other mining camps presage ill for the future of law and order in Goldfield, if federal troops are withdrawn.

"It was strongly urged that the experience of other mining camps with the Western Federation of Miners gave good grounds for the belief that should the mine operators insist on maintaining their position, as above stated, serious disorder would be likely to ensue immediately upon the withdrawal of the troops. All this, however, is purely a matter of future possibilities and not of actual present or past disorders in Goldfield. From the almost unanimous consensus of opinion of all witnesses we are satisfied that in the Miners' Union of Goldfield there are not over a few hundred men of a dangerous type —men who would readily resort to violence to accomplish their ends. The great majority, probably over three-fourths of the union, while loyal to their organization, were conceded to be men of law-abiding tendency who would not willingly initiate or support deliberate violence. But there is likewise little doubt but that this large proportion of orderly men have in the past permitted themselves and their organization to be dominated and controlled in its public actions by vicious leaders, and have lacked either the coherence or the courage to suppress this element and conduct the affairs of their organization in a way to command public respect and confidence. In the early part of the present year the Miners' Union of Goldfield permitted a celebration to be held by the union and a procession under its auspices to march through the streets of that city carrying the red flag of anarchy as a sole emblem, and bearing aloft legends and mottoes of an incendiary character. It is claimed that but a small proportion of the Miners' Union took part in the procession, but it had received the official sanction of the union, and, so far as is publicly known, was never repudiated by that body. Their personal good character cannot excuse members of the Goldfield Union for permitting their leaders to outrage decent sentiment, and cannot save the organization to which they belong

from bearing the reputation it has earned. By permitting their organization to be managed and controlled by men of violent tendencies, the union as a body has thus laid itself open to the reproach of being a vicious organization, and has furnished a foundation for the fear existing in Goldfield that it will support violence and disorder to win its present strike.

"In view of the foregoing facts, we believe there is considerable danger that serious disorders will be attempted if the troops be withdrawn and the mine operators insist on carrying out their publicly announced policy."

Subsequently, and on the 17th day of January, 1908, the Legislature of the state of Nevada, by practically a unanimous vote, adopted a resolution, wherein it was recited that:

"Conditions exist in the state of Nevada, that border upon and threaten an immediate state of domestic violence, and said state of Nevada has no State Militia or other adequate police force at its disposal sufficient to protect its inhabitants against such domestic violence, therefore, be it resolved, that application is hereby made by the Legislature of Nevada to the President of the United States to retain in the Goldfield Mining District of Nevada a sufficient force of the United States Army to protect said state against domestic violence, and to insure to the inhabitants of that community and the state domestic tranquility, the preservation of law and order, and the observance of the laws of the United States and the state of Nevada, and that such portion of the United States Army be maintained in said district until the state of Nevada, through its Legislature now in extraordinary session assembled, shall be able to provide by law for the organization and equipment of the State Constabulary or other police force, sufficient to maintain law and order, and suppress any domestic violence that may occur."

After the strike was declared, a strike committee, consisting of five members of the respondent union, was appointed. The joint affidavit filed by the members of this committee contains the following statements: "Affiants ever since their appointment have acted and still act as such committee, with power and authority to oversee and regulate the conduct of said strike. That affiant has taken an active interest in said strike, keeping in touch with all union men engaged therein. * * * On account of the greatness of the territory necessary to be covered the picket system was found by affiant and said committee and union to be practically useless, and for that and other reasons such system has been adopted only to a limited degree; that is to say, no person has been detailed to any particular duty or assigned to any particular place, but volunteers have gone to the neighborhood of said premises as hereinafter described; no squads or other aggregations of miners and no so-called picket lines have been organized, but union members of their own volition, without special or any direction from or understanding with said union or any of the members, officers, or committees, have from time to time gone in the neighborhood of complainant's premises, in numbers ranging from thirty up to seventy-five, but they do so without concert among themselves. * * * No miners have kept constant watch on complainant's premises; on the contrary, they have not approached said premises save at the hours of the morning and afternoon changes of shifts, refraining entirely from approaching said premises after dark. * * * All miners belonging to said union are instructed * * * peaceably to address any nonunion miner willing to listen, and endeavor in a lawful manner to persuade him to join said union or refrain from injuring the cause of labor by taking the place of union miners." They are also instructed "not to trespass upon or congregate about complainant's property, or anywise molest it, or threaten or intimidate any nonunion miner. * * * To indulge in no act to which the officers of the law, or complainant, or any mine owner or operator could reasonably object. * * * Not to congregate in undue numbers near complainant's property or anywhere, and to refrain from all threats or acts of intimidation whatsoever." And all members engaged in the strike were "instructed by affiant not to * * * carry any deadly weapon." The affiant also states that each member of said strike committee has kept in close and constant touch with all members engaged in said strike, and has been in a position to ascertain and know, and does know, that these instructions have been implicitly obeyed; that no miner or member of the union has trespassed on complainant's property, or demand-

ed of any employé that he should not work, or threatened him with death, deportation, or anything calculated to arouse his fears, or that he would be otherwise interfered with, or "committed any act of intimidation," or censured or found fault with any employé of complainant, or molested him in any respect, so far as affiant has been able to observe or ascertain. The affiant also says that no "agreement, combination, or conspiracy ever existed, nor does it now exist, to prevent complainant from working its properties or shipping the ores mined therefrom, or at all."

The testimony on the part of complainant tends to show that members of the union are nearly all of the time, day and night, stationed at various points on and about complainant's premises, their numbers varying from 15 to 150, and even 200 on occasions; that they are apparently under the charge of captains, the greatest number being stationed at the crossing of the railroad traversed by the men in going from the Combination Mine and Mill to the company's boarding house. This is supported by some 22 photographs taken December 29th and 30th and January 2d, 5th, and 7th; 19 of these views are of men in groups of from 3 to 50 or more, standing on or near the above-mentioned crossing. Many affidavits have been introduced by complainant, made by its employés, and also by guards and deputy sheriffs in its employ, testifying to their actual experiences. These state that the men going to and from the boarding house to the mines are sent in a body; that on occasions it has been difficult for the guards and deputy sheriffs to open a path through the pickets, so numerous were they. The men going to and from work are compelled to pass by or through squads of pickets who endeavor to prevent them from working, by assailing them with threats, ridicule, and insults; some of the men have been threatened with personal violence and deportation; several have been photographed for identification. December 13th two ladies, one of them over 60 years of age, while escorting a relative from the Combination Mill, where he had been at work, were met by a crowd of pickets, who addressed them with vile and insulting language. These ladies were followed by pickets to the town of Goldfield. The employés are said to be in more or less fear of the pickets; some have already quit work, and many others will follow when the troops are withdrawn, unless adequate protection is given. If such protection is given, there are plenty of men ready and willing to work for complainant on the terms offered. Complainant is now employing 150 miners, and could obtain and put to work 750 but for the intimidations and unlawful acts and conduct of the respondents. Complainant ever since the beginning of the strike has had in its employ an average of about 50 guards and deputy sheriffs at an expense of $250 a day. These men are employed to protect the company's property and its employés. A body of troops is stationed within a few hundred yards of the place where the pickets assemble.

C. S. Thomas, W. H. Bryant, and W. P. Malburn, for complainant.
Augustus Tilden, for respondents.

FARRINGTON, District Judge (after stating the facts as above). 1. Evidence as to the probable and possible injuries which may result to complainant if members of the Goldfield Miners' Union are permitted to assemble and hold meetings pending this suit is not of such a character as to warrant an interlocutory order forbidding such assemblages. An injunction pendente lite should not usurp the place of a final decree neither should it reach out any further than is absolutely necessary to protect the rights and property of the petitioner from injuries which are not only irreparable, but which must be expected before the suit can be heard on its merits. Only those issues will be determined which are necessary factors in granting or denying a temporary restraining order. It is not necessary that the complainant's rights be clearly established, or that the court

find complainant is entitled to prevail on the final hearing. It is sufficient if it appears that there is a real and substantial question between the parties, proper to be investigated in a court of equity, and in order to prevent irremedial injury to the complainant, before his claims can be investigated, it is necessary to prohibit any change in the conditions and relations of the property and of the parties during the litigation. 22 Cyc. 822; 6 Pomeroy's Eq. Juris. §621; Harriman v. Northern Securities Co. (C. C.) 132 Fed. 464, 485.

2. Complainant is the owner of the Combination Mines, and also the owner of more than 97 per cent. of the capital stock of the several subsidiary corporations which own the Mohawk, Laguna, and other mining properties mentioned in the complaint. It is urged that as a stockholder in these corporations complainant cannot maintain a suit for the relief sought without showing actual or virtual refusal by each of said corporations to bring the suit. This objection is based on the rule that a stockholder cannot sue in his own behalf on a corporate cause of action. The objection might be good if the Goldfield Consolidated Mines Company, merely as a stockholder, was asking relief for wrongs to property of the tributary corporations. But such is not the case. The allegations of the bill show that complainant is engaged in the business of mining, developing, and operating the property of these corporations, and that respondents, unless restrained, will unlawfully interfere with this business. The right to operate a mine and carry on the business of mining therein is property, whether the operator owns the mine or not. It is a right as distinct and real as the ownership of the fee itself. If complainant has such right, it has the further right to enjoy such property, and to operate the mines free from unlawful molestation and interference, and it naturally follows that the power of a court of equity may be invoked to protect such right, even though the operator may not own the mine, or even a share of stock in the company which does own the mine.

3. Respondents urge that, inasmuch as complainant is a corporation organized under the laws of the state of Wyoming, it can have no standing in this proceeding, unless it exists in conformity with the Constitution and laws of that state. It is recited in the bill, and also in the plea and answer, that complainant owns more than 97 per cent. of the capital stock of the Goldfield Mohawk Company, the Red Top Mining Company, the Jumbo Mining Company, Laguna Goldfield Mining Company, and Goldfield Mining Company, and that, under the laws of Wyoming, no corporation can be formed for the principal purpose of holding stock in other corporations. Without deciding whether such an objection can be raised in this proceeding, or by any party other than the state of Wyoming itself, it is proper to quote that portion of the statute referred to:

"It shall not be lawful for such company to use any of its funds in the purchase of any stock in any other company, nor in its own; provided, however, such company may in its discretion purchase, hold and own any stock, and to any amount in any other company that is or may be subsidiary or tributary to, and that does contribute to the objects and purposes of the first company in this proviso mentioned." Section 3040, Rev. St. Wyo. 1899.

Sufficient evidence has not been introduced to support a finding that complainant has violated this statute. It has been held that, where a suit is brought by a corporation to enforce or protect a private right by injunction, a claim that the corporation is illegal or is a monopoly cannot be made collaterally as a defense. Am. Steel & Wire Co. v. Wire Drawers', etc., Unions (C. C.) 90 Fed. 608, 614; Allis-Chalmers Co. v. Reliable Lodge (C. C.) 111 Fed. 264, 266.

4. The evidence shows that a number of persons within the past two years have been deported from Goldfield, and in several cases the victim has been ordered, or advised to leave, by an officer of the respondent union. None of these incidents in evidence, however, have any direct connection with the present labor trouble in Goldfield. Those who have been deported appear in some way to have incurred the hostility of the Western Federation of Miners during the labor difficulties in Idaho or Colorado, and for this, and not for any participation in the present trouble, they were punished. The deportations were accompanied in some cases by violent beatings, and in other instances, the undesired person left camp immediately on being ordered to do so.

5. The respondents allege, in substance, that the Goldfield Consolidated Mines Company entered into an unlawful combination with other corporations and mine and mill owners to prevent the employment of, to oppress, to boycott, and to drive from said district all laborers in and about the mines thereof, the respondents included, who will not conform to and accept the scale of wages, and other conditions of employment, which the members of the combination dictate, and, in furtherance of this conspiracy, they adopted and published the resolutions of December 9, 1907. The argument is made that by reason of this alleged conspiracy, complainant is not in court with clean hands, and therefore is not entitled to equitable relief, either temporary or permanent.

The Nevada statute, Laws of 1903, p. 207, c. 111, provides as follows:

"Section 1. It shall be unlawful for any person, firm or corporation to make or enter into any agreement, either oral or in writing, by the terms of which any employee of such person, firm or corporation, or any person about to enter the employ of such person, firm or corporation, as a condition for continuing or obtaining such employment, shall promise or agree not to become or continue a member of a labor organization, or shall promise or agree to become or continue a member of a labor organization.

"Sec. 2. Any person or persons, firm or firms, corporation or corporations, violating the provisions of section 1 of this act shall be deemed guilty of a misdemeanor," etc.

The agreement to be executed by the employés as provided for in the resolution is plainly in violation of this statute. But complainant contends that the statute is unconstitutional, and that its right to exclude members of the Western Federation of Miners from its employ, and to employ nonfederation men who are willing to work at the reduced wage scale, is guaranteed by the federal and state Constitutions.

It is provided by section 1 of the fourteenth amendment to the Constitution of the United States as follows:

159 F.—33

"Nor shall any state deprive any person of life, liberty or property without due process of law, nor deny any person within its jurisdiction the equal protection of the laws."

The Constitution of Nevada, art. 1, § 8, has a similar provision:

"No person shall be * * * deprived of life, liberty, or property, without due process of law."

The obvious purpose of the Nevada statute just quoted is to invade and control the discretion of the employer in selecting his men. If the statute is valid, an employer cannot make it a condition on which he will hire men that they shall not belong to any particular labor union; to do so is made a crime, no matter how vicious, turbulent, or lawless the organization may be. This statute lays no similar restriction upon the employés. Their freedom of contract is unrestrained. There is nothing in the statute which forbids union men from discriminating against nonunion men, or nonunion men from discriminating against union men. There is nothing which prevents union men from exacting, as a condition upon which they will work, an agreement that every nonunion man must be discharged, or join the union.

It may be to the advantage of a manufacturer to do business exclusively with some one labor union; its patronage may be immensely valuable to him; but to contract with his men that they must be members of such union, it matters not how wisely that organization may be controlled, or how great the advantage and profit to the master and his servants, if the latter become members of the organization, the employer, under the statute, is guilty of a crime if he insists, as a condition of employment, that his employés shall join the union. On the other hand, another operator may believe that the success of his business depends upon the undivided loyalty and support of his men, and that he cannot have such loyalty and support if they belong to, and are bound to submit to the control of, a labor organization; but he also violates this statute by exacting as a condition of employment that his men shall not join a union.

Among the reasons formally assigned in the statement of the association, dated December 1, 1907, justifying the action and resolution of the mining company, we find the following:

"4. The Union has encouraged, protected and assisted its members in the crime of stealing ore from the mines of the district. * * * During the six months ending December 31st, 1906, there was stolen from the Mohawk Mine alone not less than one million dollars, and during the past six months there has been taken from the Little Florence Mine not less than two thousand dollars per day. The union has refused to permit underground watchmen (and) ordered a strike when effective change rooms were placed upon the property."

It is a constitutional right of an employer to refuse to have business relations with any person or with any labor organization, and it is immaterial what his reasons are, whether good or bad, well or ill founded, or entirely trivial and whimsical. Under the conditions existing in Goldfield at the time the resolutions were published, it is possible that the only practical method of exercising this right was to require all employés to refrain from being or becoming members of the Western

Federation of Miners. Thus we have a right guaranteed by the Constitution, and its exercise blocked, or at least hindered and restricted, by the statute of Nevada. It is too clear to require a citation of authorities that the Legislature has no power to restrict the exercise of a constitutional right, unless the interests of the public, as distinguished from the interests of the individual, or of a class of individuals, demand such restraint. The act so forbidden by the Legislature must be detrimental to the public welfare, and the health, safety, or morals of the community to justify such interference. There can be no pretense here, and none is made, that the execution of such a contract as the one in question has any tendency to injure the health, safety, or morals of the public, or of either employer or employés. It is clear that the Nevada statute deprives the employer of the right to contract as to certain matters which may be vital to him, and that it also, while not preventing, does obstruct the exercise of his right to exclude objectionable persons from his employ. The fact that the statute includes an element which is not found in any other similar statute to which attention has been called, in that it prohibits contracts requiring employés to join a union as a condition of employment, in no wise heals its invalidity; the added element simply makes larger and wider the invasion of the liberty of the employer to fix the terms and conditions upon which he will contract for labor.

The terms "life, liberty, and property" as used in the federal Constitution, embrace every right which the law protects. They include not only the right to hold and enjoy, but also the means of holding, enjoying, acquiring, and disposing of property. The right to labor is property. It is one of the most valuable and fundamental of rights. The right to work is the right to earn one's subsistence, to live and to support wife and family. The right of master and servant to enter into contracts, to agree upon the terms and conditions under which the one will employ and the other will labor, is property. The master has the right to fix the terms and conditions upon which he is willing to give employment; the servant has the right to fix the terms and conditions upon which he will labor, and any statute which curtails and limits that right deprives the party affected of his property, and, in the same measure, of his liberty. Both parties are free to enter into, or refuse to enter into, the contract. Before the law, there is the same freedom to employ as to work, to buy as to sell, to choose one's employé as to choose one's employer.

"The liberty of contracting relating to labor, includes both parties; the one has as much right to purchase as the other to sell labor." Allgeyer v. Louisiana, 165 U. S. 578, 17 Sup. Ct. 427, 41 L. Ed. 832; Lochner v. New York, 198 U. S. 45, 56, 25 Sup. Ct. 539, 49 L. Ed. 937.

"One citizen cannot be compelled to give employment to another, nor can any one be compelled to be employed against his will." Gillespie v. The People, 188 Ill. 176, 58 N. E. 1007, 52 L. R. A. 283, 80 Am. St. Rep. 176.

The right of an employer to refuse to employ any particular individual, or any class of individuals, is neither greater nor less than the right of a man to refuse to work for any particular individual, or class of individuals. The reason for the refusal can in no wise control, en-

large, or diminish the legal right of refusal, the right to employ, or the right to refuse to be employed.

"It is a part of every man's civil right that he be left at liberty to refuse business relations with any person whomsoever. whether the refusal rests upon reason. or is the result of whim, caprice, prejudice, or malice. With his reasons neither the public nor third persons have any legal concern. It is also his right to have business relations with any one with whom he can make contracts." 2 Cooley on Torts, p. 587.

Statutes similar to the Nevada act in question have existed in other states, but, in every jurisdiction where their validity has been called in question, they have been held invalid, under the constitutional provision that no one shall be deprived of life, liberty, or property without due process of law. Adair v. United States, 208 U. S. 161, 28 Sup. Ct. 277, 52 L. Ed. ——; People v. Marcus, 185 N. Y. 257, 77 N. E. 1073, 7 L. R. A. (N. S.) 282, 113 Am. St. Rep. 902; Id. (Sup.) 97 N. Y. Supp. 323; State ex rel. Zillmer v. Kreutzberg, 114 Wis. 530, 90 N. W. 1098, 58 L. R. A. 748, 91 Am. St. Rep. 934; Coffeyville, etc., Co. v. Perry, 69 Kan. 297, 76 Pac. 848, 66 L. R. A. 185; State v. Julow, 129 Mo. 163, 31 S. W. 781, 29 L. R. A. 257, 50 Am. St. Rep. 443; Gillespie v. People, 188 Ill. 176, 58 N. E. 1007, 52 L. R. A. 283, 80 Am. St. Rep. 176; State v. Goodwill, 33 W. Va. 179, 10 S. E. 285, 6 L. R. A. 621, 25 Am. St. Rep. 863; Railway Co. v. Schaffer, 65 Ohio St. 414, 62 N. E. 1036, 87 Am. St. Rep. 628.

In Adair v. United States, supra, Adair, a foreman for the Louisville & Nashville Railroad Company, discharged O. B. Coppage, a fireman in the employ of the company, on the ground that he was a member of a labor organization. Adair was convicted in the District Court of the United States for the Eastern District of Kentucky, under the tenth section of the act of Congress of June 1, 1898, 30 Stat. 428 [U. S. Comp. St. 1901, p. 3210] which provides, among other things that:

"Any agent or officer" of an interstate carrier, "who shall require any employee, or any person seeking employment, as a condition of such employment, to enter into an agreement either written or verbal, not to become or remain a member of any labor corporation, association or organization; or shall threaten any employee with loss of employment, or shall unjustly discriminate against any employee because of his membership in such labor corporation, association, or organization * * * is hereby declared to be guilty of a misdemeanor."

The lower court (152 Fed. 737) held that it was within the power of Congress to enact such a law under the provisions of the commerce clause of the federal Constitution, but it is significant (page 753 of 152 Fed.) that the court refused to criticise the decisions of the states of Missouri, Illinois, Wisconsin, and New York, in which similar statutes were held to be unconstitutional. On the contrary, the court intimated that those decisions were correct, because such legislation by a state is in violation of the fourteenth amendment. In other words, Congress may, but the states cannot, enact such a statute. The case was taken to the Supreme Court of the United States, and there the provision of the statute, under which the defendant was convicted, was held to be an illegal in-

vasion of the personal liberty, as well as of the right of property, of the defendant Adair, and therefore unconstitutional. The court said:

"While, as already suggested, the rights of liberty and property guaranteed by the Constitution against deprivation without due process of law is subject to such reasonable restraints as the common good or the general welfare may require, it is not within the functions of government—at least in the absence of contract between the parties—to compel any person in the course of his business and against his will to accept or retain the personal services of another, or to compel any person, against his will, to perform personal services for another. The right of a person to sell his labor upon such terms as he deems proper is, in its essence, the same as the right of the purchaser of labor to prescribe the conditions upon which he will accept such labor from the person offering to sell it. So the right of the employé to quit the service of the employer, for whatever reason, is the same as the right of the employer, for whatever reason, to dispense with the services of such employé. It was the legal right of the defendant Adair, however unwise such a course might have been, to discharge Coppage because of his being a member of a labor organization, as it was the legal right of Coppage, if he saw fit to do so, however unwise such a course on his part might have been, to quit the service in which he was engaged, because the defendant employed some persons who were not members of a labor organization. In all such particulars the employer and the employé have equality of right, and any legislation that disturbs that equality is an arbitrary interference with the liberty of contract which no government can legally justify in a free land."

In People v. Marcus (Sup.) 97 N. Y. Supp. 323, the defendant was convicted under a statute forbidding an employer to exact an agreement from an employé, as a condition of employment, not to join a labor union. The case was appealed to the Supreme Court, and subsequently to the Court of Appeals. In both appellate courts the statute was held invalid, because it was in contravention of the fourteenth amendment to the Constitution of the United States. The Supreme Court used the following language:

"The contracts at which the provision of the Penal Code in question is aimed, it is true, do discriminate against labor unions; but that is in the lawful exercise of the right of the employer to employ whomsoever he pleases, and it is not competent for the Legislature to make it a crime for him to decide the question upon considerations of race, or of religion, or of the affiliations of the individual with civic organizations, unless, of course, he makes a contract contrary to public policy and affecting the state itself, as, for instance, imposing as a condition that the employé shall not join the National Guard, the maintenance of which is essential to the peace and safety of the people of the state. The statute, however, clearly discriminates in favor of labor unions by forbidding an employer either to impose as a condition of employment that the employé shall sever his relation with the union, or, if not a union man, shall not join a union. In the making of such a contract, both the employé and the employer are acting within their strict legal rights. The employé is not obliged to accept the employment on those conditions, and the employer is not obliged to give it without them."

An unlawful conspiracy is a combination between two or more persons to do an unlawful or criminal act, or to do a lawful act by criminal or unlawful means. 8 Cyc. 620.

An examination of the resolution in question shows that the association agreed to do five acts, namely: First, to reduce the wages of the men employed by the various members of the association; second, to resume operations, giving preference to old employés; third, to reduce the cost of living in Goldfield District 20 per cent.; fourth,

to have no further dealings with the Goldfield Miners' Union, or any organization affiliating with the Western Federation of Miners; fifth, to require each person presenting himself to any member of the association for employment to sign, as a condition of such employment, an agreement that he is not, and during the period of his employment will not become, a member of respondent union. The fifth item may be regarded as the means agreed upon to accomplish the first and the fourth. None of the proposed acts are either unlawful or criminal. For these reasons I must hold that complainant in entering into the agreement with the other members of the Goldfield Mine Operators' Association, which is embodied in the resolutions of December 7, 1907, was not guilty of any unlawful conspiracy against the respondents.

6. Is the evidence sufficient to show the establishment of a picketing system and concerted action by the pickets to coerce and intimidate the employés of the mining company, and thus prevent complainant from operating its mines? The union, by unanimous vote of those present at the meeting of November 26th, declared a strike, and later appointed a strike committee composed of five members. This committee is clothed "with power and authority to oversee and regulate the conduct of said strike." The members of this committee state in their joint affidavit that the committee and the union found the picket system "practically useless," and therefore picketing "has been adopted only to a limited degree"; that is to say, men are not assigned to any particular duty or place, no picket lines or squads of pickets have been organized, but union members in numbers ranging from 30 to 75 approach complainant's premises at the hours of the morning and afternoon change of shifts, and they do this at their own volition, without any concert among themselves, and without special, or any, direction from, or understanding with said union, or any of its members, officers, or committees. This picket system as organized, evidently contemplated the active participation of every member of the union, for the affidavit states "that all of the miners belonging to said union were instructed · * * * to peaceably address any nonunion man willing to listen, and endeavor in a lawful manner to persuade him to join said union, or refrain from injuring the cause of labor by taking the place of nonunion miners." The miners were also instructed to refrain from violence, intimidation, and unlawful conduct of every kind in dealing with complainant, and with nonunion men. The miners engaged in the strike were not only carefully instructed, but evidently they were carefully watched by the members of the strike committee, each of whom says that he "has taken an active interest in said strike," and "has kept in such close and constant touch with all miners engaged in said strike," and been in such "a position to ascertain and know" the fact, that he can say that "none of said miners trespassed" on, "or in any way molested complainant's property," or demanded of any of its employés that he should not work, etc. This committee also maintains such authority over the miners engaged in the strike that each of them could testify that he would have "reprimanded and disciplined any miner en-

gaged in the strike who indulged in any act or word in the nature of a threat or intimidation."

It is as unreasonable to suppose that these men assembled without design or concert among themselves, and without any direction or understanding with the union or its officers or committees, as it is to suppose that the wheels of a watch get into place by accident. Why are all miners belonging to the union instructed "to peaceably address any nonunion miner willing to listen, and endeavor in a lawful manner to persuade him to join the union, etc? If it is not intended that the instruction should be obeyed, why is it given? It cannot be assumed for an instant that the person who gave such instructions, or that any or all of the miners who received them, had any other thought but that they were to go where the nonunion men were to be found, and address them. At this time the respondent union counted on its rolls about 1,200 resident miners, of whom in the neighborhood of 750 had, before the strike, been employed in complainant's mines. After "all of the miners belonging to the union" are so instructed, it is not at all remarkable that from 30 to 75 of them, or even as many as 200, as complainant's affidavits show, assemble at or near the crossing between the Combination Mines and the company's boarding house. If all these men obeyed instructions, and the affidavit of the strike committee says they did, the common design and purpose which they were each and all seeking to effect was to induce nonunion miners to join the union, and not to work for complainant. If the nonunion men consent, the mining company, being without miners, will be unable to operate, and it must yield to the demands of the union, or close down the mines. On the other hand, if the nonunion men refuse, and the company obtains enough nonunion men to work its property, the strike will be a failure, the power of the Western Federation of Miners in Goldfield broken, and the members must seek work elsewhere.

Each party has the right to enter into lawful competition for the support of the nonunion miners, and to endeavor by peaceful argument or persuasion to secure their co-operation, provided the persuasion is of such a character as to leave the person solicited feeling free to do as he pleases, and he is not persuaded to do that which in him would be unlawful. This is so, because workmen, when free from contract obligations, have a legal right, singly, collectively, or as a union, to quit work; that is, to strike, and, having this right, they have the further right to use such lawful means to make the strike effective as are not inconsistent with the rights of others. Karges Furniture Co. v. Amalgamated Woodworkers' Union, 165 Ind. 421, 75 N. E. 877, 2 L. R. A. (N. S.) 788; 18 Am. & Eng. Ency. L. (2d Ed.) 88. The mining company has the right to employ nonunion men to take the places vacated by those who quit work. The latter have no legal interest or concern in the contract between the company and its new employés. The places which they vacated to strike are no longer theirs, and never again will be theirs unless they are re-employed. It is difficult to see, when a man has voluntarily given up a job, how he can maintain that he has a shadow of claim or right to the vacated place. Union Pac. R. Co. v. Ruef (C. C.) 120 Fed. 102, 128.

There is no law, nor is it within the power of this or any other court, to make an order by which the Goldfield Consolidated Mines Company can be compelled against its will to re-employ any miner who quit, or any member of the Western Federation of Miners; neither can any member of that organization be compelled against his will to work for the company. The nonunion men have the same right to work or not work, to agree upon the terms of employment, or to quit work, as union men, no more, no less. They have a perfect right to take the vacated jobs if they can agree with the company upon terms, and the respondents have no legal right to dictate what those terms shall be. They have the right to seek employment, to come and go from their work, or to go where they please on the public thoroughfare, without fear or molestation, threats, violence, or insult of any kind. They have a right to come and go without being picketed, or compelled to listen to argument or persuasion, whether it be peaceful or irritating. The pickets have no legal right to insist that any nonunion man shall listen to their solicitations if he is unwilling to do so, it matters not how peaceful and friendly such solicitations may be. Union Pac. R. Co. v. Ruef (C. C.) 120 Fed. 114. These considerations are true, because, under our system of government, every man has the right to enjoy his liberty and property until it is taken away from him by due process of law. To guard these rights is the true end and aim of our civilization. The existence of such a right in one man necessarily imposes upon every other man the duty to respect it, and upon the government and the courts the duty to guard and protect it. And it necessarily follows that any attempt to intimidate a man in order to compel him to refrain from exercising a legal right is unlawful, and this is true no matter whether the attempt is made by one man or many, or by a corporation or a labor union. Hence, if the pickets, or members of the respondent union, who gather at or near complainant's premises at the time of the morning and afternoon change of shifts, assail nonunion men with threats, ridicule, and insult, or follow them to or from their work with vile language and abusive epithets in order to compel them to quit work, or refrain from offering their labor to the complainant, they are guilty of unlawful conduct.

The affidavit of the strike committee states that the instructions given to the miners engaged in the strike have been strictly obeyed; it also states that no member of the union has violated any right of the Goldfield Consolidated Mines Company, or of its employés, or has committed any act of violence or intimidations, or in any way molested complainant or the nonunion men. It should also be stated here that no evidence on the part of either complainant or respondents identifies any particular member of Goldfield Miners' Union with any specified act of violence or intimidation against the men who are now working for, or offering their labor to, the company. The affidavits on the part of complainant, as well as other evidence in the case, however, convince the court that the company's premises are almost constantly picketed, day and night, by members of the Miners' Union; that there are altogether too many pickets, especially at the railroad crossing used by the workmen in going to and from the mines

and mill to the company's boarding house. The unnecessary massing of so many men at this point is, in itself, an act of intimidation, which is further aggravated by insults, threats, and ridicule. It is not necessary that a man should be knocked down to be intimidated. The most reprehensible intimidation may exist not only without violence, but without words, or even the lifting of a finger. Whether conduct is intimidating or not depends upon the circumstances of each case. What would fill a timid man with fear might only provoke the mirth of a strong man; and a simple request, when backed up by a display of physical force, may overawe the most determined man, even though there is neither threat nor violence. The vast majority of wage-earners are peaceful, law-abiding men, who instinctively avoid trouble and the giving of offense. Such men would cease working or refuse to work if compelled to run the gauntlet of a picketing system such as the evidence shows is in force at and near complainant's premises in Goldfield. Notwithstanding the denials of the respondents, the affidavits of so many witnesses, guards, and employés who testify to what they have actually seen and heard, who have repeatedly passed by or made their way through squads of pickets at the crossing, and who were often the victims of ridicule, insult, and threat, leave no doubt in the mind of the court that the pickets were, in the main, members of the Goldfield Miners' Union; that they so assembled with a common purpose, and that purpose was to coerce and intimidate nonunion men who wished to work for, or who are already in the employ of the company. This conviction is strengthened by the fact that the complainant has 50 guards and deputy sheriffs in its employ for the protection of its employés. It is unreasonable to suppose that complainant would go to an expense of $250 per day for this purpose if guards were not needed. Otis Steel Co. v. Local Union, No. 218 (C. C.) 110 Fed. 698. The fact that men have quit and refused to work, and the further fact that it is the custom to send and have the men go in a body between the mines and the company's boarding house, and that guards are stationed on the way, show that there is something in the appearance, conduct, language, or numbers of the pickets which inspires fear among the employés of the company. It is significant that all these precautions are taken while a body of federal troops is stationed only a few hundred yards away. It also appears that the company cannot, by reason of the fear which exists, obtain a sufficient number of men to operate its mines. Peaceful picketing, in theory, is not only possible, but permissible, and, as long as it is confined strictly and in good faith to gaining information, and to peaceful persuasion and argument, it is not forbidden by law. Unfortunately, peaceful picketing is a very rare occurrence. This follows from the very nature of things. Men who want to work for an employer who is eager to employ them must be persuaded not to work—persuaded not to exercise their legal rights. In such case, peaceable solicitation is of but little effect, and when it becomes persuasion by intimidation it is universally condemned, and has been declared unlawful in every jurisdiction where the question has been raised. These views will find

abundant support, not only in the cases which have already been cited, but in the following authorities: In re Doolittle (C. C.) 23 Fed. 545; Mackall v. Ratchford (C. C.) 82 Fed. 41; American Steel & Wire Co. v. Wire Drawers', etc., Unions (C. C.) 90 Fed. 608, 614; Southern R. Co. v. Machinists' Union (C. C.) 111 Fed. 54; Union Pac. R. Co. v. Ruef (C. C.) 120 Fed. 124; Knudsen v. Benn (C. C.) 123 Fed. 636; Atchison, T. & S. F. Ry. Co. v. Gee (C. C.) 139 Fed. 582, 584; Pope Motor Car Co. v. Keegan (C. C.) 150 Fed. 148; Allis-Chalmers Co. v. Iron Molders' Union (C. C.) 150 Fed. 155, 179; Beck v. Ry. Teamsters' Protective Union, 118 Mich. 497, 77 N. W. 13, 42 L. R. A. 407, 74 Am. St. Rep. 421; Vegelahn v. Guntner, 167 Mass. 92, 44 N. E. 1077, 35 L. R. A. 722, 57 Am. St. Rep. 443; Jensen v. Cooks' & Waiters' Union, 39 Wash. 531, 81 Pac. 1069, 4 L. R. A. (N. S.) 302; Fletcher Co. v. International Ass'n of Machinists (N. J. Ch.) 55 Atl. 1077; O'Neil v. Behanna, 182 Pa. 236, 37 Atl. 843, 38 L. R. A. 382, 61 Am. St. Rep. 702; Winslow Bros. Co. v. Building Trades Council, 31 Chicago Legal News, 337, cited in note to Jensen v. Cooks' & Waiters' Union, 4 L. R. A. (N. S.) 306.

In Mackall v. Ratchford (C. C.) 82 Fed. 41, the defendants had joined a body of over 200 striking miners in marching with music and banners by one of the mines belonging to the complainant. The men marched and countermarched along the public highway for 3 days, early in the morning and again late at night when the men were coming off shift, and on each occasion the men taking part in the procession stopped on each side of the road where the miners must cross in going to and from the mine. The avowed object of the strikers was to induce the miners to join the strike. There were no threats and no loud, boisterous, or taunting language. The court found that the purpose was to intimidate the men, and thereby induce them to abandon their work, and secure their co-operation in closing the mines. It was held that the conduct of the defendants was intimidating and unlawful, and they were punished for violating the preliminary injunction.

In American Steel & Wire Co. v. Wire Drawers', etc., Unions (C. C.) 90 Fed. 608, 614, the court said:

"The truth is that the most potential and unlawful force or violence may exist without lifting a finger against any man, or uttering a word or threat against him. The very plan of campaign adopted here was the most substantial exhibition of force, by always keeping near the mill large bodies of men, massed and controlled by the leaders, so as to be used for obstruction if required. * * * Such a force would be violence, within the prohibition of the law; and its exhibition should be enjoined as violating the property rights of the plaintiffs in the streets, their liberty of contracting for substituted labor, and the liberty of the substitutes to work if they wished to accept the lowered wages, and to pass through the streets to their work."

In Beck v. Railway Teamsters' Protective Union, 118 Mich. 497, 77 N. W. 13, 42 L. R. A. 407, 416, 74 Am. St. Rep. 421, members of a union followed the complainant's teamsters along the street, hallooing at them, and using abusive language, and intercepting on the street those who were going to the mill with their teams. In reference to this the court said:

"To picket complainant's premises in order to intercept their teamsters or persons going there to trade is unlawful. It itself is an act of intimidation, and an unwarrantable interference with the right of free trade. * * * It will not do to say that these pickets are thrown out for the purpose of peaceable argument and persuasion. They are intended to intimidate and coerce. As applied to cases of this character, the lexicographers thus define the word 'picket': 'A body of men belonging to a trades union sent to watch and annoy men working in a shop not belonging to the union, or against which a strike is in progress.'"

In United States v. Kane (C. C.) 23 Fed. 748, no force was used by the strikers, there were merely persuasions to quit work. The court, however, held that these persuasions were made under such circumstances, and by such numbers, that it tended to intimidate the men who desired to work, and those who participated were punished.

In Pope Motor Car Co. v. Keegan (C. C.) 150 Fed. 148, 150, this language is used:

"Large numbers of strikers were congregated in the neighborhood of the works, and used threatening and intimidating language to employés and officers of the complainant. Undoubtedly such conduct is unlawful. The presence of a large number of strikers, under such circumstances, is in itself intimidating."

7. The evidence clearly shows that complainant and its employés have been and are victims of unlawful picketing, and, if we may judge the intention and the design of the pickets by their conduct, they have been and are actuated by a common purpose to injure complainant's business by coercing and intimidating its men.

Judge Sanborn says in Allis-Chalmers Co. v. Iron Molders' Union (C. C.) 150 Fed. 155, 181:

"There can be no doubt, as it seems to me, that the constant and regular maintenance of the pickets after repeated acts of violence by pickets, the use of abusive epithets, the creation of an unfriendly atmosphere surrounding the workmen, with the other conditions mentioned, constitute a clear case of conspiracy among the pickets to unlawfully intimidate and coerce the workmen."

In Eddy on Combinations, § 539, it is said:

"A picket is the agent of a combination. * * * In determining the object of the combination, the courts will probe deeper than resolutions and mere professions of good will and lawful intentions. It unfortunately happens that there is seldom a case where a picket is maintained that the members of the picket or their hangers-on do not resort to acts of violence, and to jeers, cries, epithets, and threats calculated and intended to intimidate workmen who are not members of the combination. So true is this that the very term 'picket' has come to mean in the popular mind threats, violence, and intimidation. It is conceivable, however, that a picket entirely lawful might be established about a factory, but such a picket would go no further than interviews and lawful persuasion and inducement. The slightest evidence of threats, violence, or intimidation of any character ought to be sufficient to convince court and jury of the unlawful character of the picket, since the picket, under the most favorable consideration, means an interference between employer seeking employés and men seeking employment."

8. Whether the union is an original conspirator or whether, after it became aware of the coercive conduct of the pickets, it became a party to the conspiracy by co-operating with and supervising them, is immaterial. In either event, the Miners' Union is a conspirator and is responsible for the acts of its co-conspirators.

In the recent case of United States v. Standard Oil Co. (C. C.) 152 Fed. 290, 294, the court uses the following language:

"The Waters-Pierce Oil Company is still a distinct legal entity, a corporation of the state of Missouri. The knowledge of its officers and directors is its knowledge, and those officers and directors cannot have caused this corporation to act its important part in the accomplishment of the purpose of this conspiracy without knowledge of the conspiracy, its scheme, its object, and its effect. One who learns of a conspiracy after it is formed, and then joins it, or knowingly aids in the execution of its scheme, and shares in its profits, becomes from that time as much a co-conspirator as if he were one of those who originally designed it and put it in operation. * * * If a series of acts are to be performed with a view to produce a particular result, he who aids in the performance of any one of these acts, in order to bring about the result, must have the intention to effectuate the end proposed, and if he operates with others, knowing them to have the same design, there is in fact an agreement between him and them. His criminal intent is not to be distinguished from the intent of those who first formed the plans of the conspiracy."

Judge Shaw, in Commonwealth v. Hunt, 4 Metc. (Mass.) 111, 38 Am. Dec. 346, 355, says:

"When an association is formed for purposes actually innocent, and afterward its powers are abused, by those who have the control and management of it, to purposes of oppression and injustice, it will be criminal in those who thus misuse it, or give consent thereto."

In order to demonstrate that the union originated or joined this conspiracy, it is not necessary to prove any formal or explicit agreement. The existence of a conspiracy may be shown by circumstantial evidence.

"Where an unlawful end is sought to be effected and two or more persons, actuated by the common purpose of accomplishing that end, work together, in any way, in furtherance of the unlawful scheme, everyone of said persons becomes a member of the conspiracy." United States v. Babcock, 24 Fed. Cas. No. 14,487; The Mussel Slough Case (C. C.) 5 Fed. 680, 684; United States v. Cassidy (D. C.) 67 Fed. 698, 702; Spies v. People, 122 Ill. 170, 12 N. E. 865, 17 N. E. 898, 3 Am. St. Rep. 320.

The system of picketing was adopted by the union and its strike committee, and this picketing has been and is under the supervision of the union, through its strike committee. Each member of the committee has taken an active interest in the strike, keeping in close and constant touch with all union men engaged therein, and all, or nearly all, of the pickets are members of the union. Even if it were possible to believe that the union was innocent of any improper design when it adopted the picketing system "to a limited degree," it is idle to contend that it has remained in ignorance of the misconduct of its pickets. The knowledge of the strike committee was the knowledge of the union. Spaulding v. Evanson (C. C.) 149 Fed. 913. Nevertheless, the union, through its strike committee, continued its supervision of the strike, and its members continued to threaten and abuse nonunion men. The coercion was in behalf of the union, for the benefit of the union, and in aid of the strike inaugurated by the union. The union cannot now, while it is consciously and uncomplainingly accepting the benefits of this terrorism, relieve itself from responsibility by saying that it has always instructed the miners against lawlessness of every sort.

Neither the history of the Goldfield Miners' Union, nor its conduct as detailed in the evidence, justifies any assumption that it was guilt-

less of wrongful purpose in adopting a system of picketing.  There is hardly a page in the history of picketing which does not record lawless deeds and acts.  When the union, by its instructions, practically made all its members pickets, it was bound to anticipate the natural and almost inevitable consequences, to foresee that the pickets would do just what they did and are doing, or something worse.  We are justified in assuming that the union intended and designed, and therefore conspired, to effect the natural consequences of its acts.  It is idle to talk of 30 to 75 pickets, and at times more than 100, gathering twice a day at the crossing for friendly solicitation.  Such bands of men were never sent by the union to confer with the Mine Operators' Association.  The picketing, designed by the instructions, was designed and intended to inspire fear and apprehension among the employés.  Such assemblages are never conducive to fair argument; they are simply intended to back up persuasion with a display of physical force.

In Union Pacific R. Co. v. Ruef (C. C.) 120 Fed. 102, 125, the evidence showed that few of the strikers had committed any unlawful acts; it was therefore contended, for reasons similar to those urged in this case, that the injunction should be denied as to all who did not commit any unlawful acts.  They were not responsible, first, because they did not participate in the unlawful acts, and, second, because there was no sufficient evidence of a conspiracy, therefore they could not be held as co-conspirators.  The court said:

"In the light of these authorities (Allis-Chalmers Co. v. Reliable Lodge [C. C.] 111 Fed. 267; Southern R. Co. v. Machinists' Local Union No. 14 [C. C.] 111 Fed. 49; Farley v. Peebles, 50 Neb. 723, 733, 70 N. W. 231), it seems clear that all of the respondents who were members of the various organizations which established and maintained the picket line, as well as those who are shown by the evidence to have personally participated in the assaults and various acts of intimidation, must in this action be held chargeable with the results naturally flowing therefrom. * * * The strikers * * * voluntarily put into operation a system of espionage which history shows is almost universally accompanied by intimidation, force, and violence.  Can it be doubted for a moment that, had there been no strike and no picketing, there would have been no assaults, no threats, and no intimidations?"

The recent case of Franklin Union No. 4 v. The People, 121 Ill. App. 647, is a strong one.  The union declared a strike and established a picket system.  Violent assaults, threats, vile language, and other forms of intimidation were used by the pickets to coerce complainant's employés to quit work.  The court, in adjudging the union itself guilty of contempt for violating the preliminary injunction, uses the following language:

"There is no room for reasonable doubt that the union was a party to the conspiracy charged in the bill, and that the picketing was established and continued under the direction of plaintiff in error through its officers and strike committees. * * * The picket system once established, the intimidation, assaults, slugging, and bloodshed followed as naturally and inevitably as night follows day.  There can be no such thing as peaceful, 'polite and gentlemanly' picketing, any more than there can be chaste, 'polite and gentlemanly' vulgarity, or peaceful mobbing or lawful lynching. * * * Consequently the mere fact of a picket system being established by men known to be unfriendly constitutes and is a threat of physical violence and an intimidation to the peaceful man. * * * It is idle to talk of picketing for lawful persuasive purposes.  Men do not form picket lines for the purpose of conversation and

lawful persuasion. Such picketing as is established by the evidence in the case at bar is intended to annoy and intimidate, whether physical violence is resorted to or not, and is unlawful in either case. * * * The union or its members had no legal right to interfere with the business of complainants or to disturb them in their lawful business or occupation, as was done in this case, for the purpose of compelling them to make agreements with the union or its members as individuals in regard to the wages to be paid. * * * The union was the main factor in the conspiracy, and by reason of its money and its control of its members it was the real power back of the whole scheme. Under the authorities cited above and many others and the evidence the union must be held guilty of willfully violating the injunction, and it must suffer the consequences."

In the still more recent case of the Sailors' Union of the Pacific et al. v. Hammond Lumber Co. (C. C. A.) 156 Fed. 450, Judge Gilbert holds that the fact that the disorders of the strike were deprecated by the officers and leaders of the unions does not relieve the unions of responsibility, or render the court powerless to deal with them in their collective capacity, for violent acts committed and threatened to be continued.

9. "That conditions exist" in Goldfield "which border upon and threaten an immediate state of domestic violence" is stated in the joint resolution of the Legislature of Nevada. That this apprehension is well grounded is also shown by the report of the Special Commission which investigated conditions in Goldfield by direction of the President of the United States, and also by the action of the authorities in retaining the troops in Goldfield. The commission says "the question as to possible future violence and disorder on the withdrawal of the troops" depends "largely on the personnel of the Miners' Union, and their leaders in particular." The policy and purpose of the Miners' Union and its leaders finds expression in the constitution of the Western Federation of Miners and in the constitution of the Goldfield Miners' Union No. 220. The former preamble to the constitution of the Western Federation of Miners declared that one of the objects of that organization is "to use all honorable means to maintain and promote friendly relations between ourselves and our employers, and endeavor by arbitration and conciliation, or other pacific means, to settle any difficulties which may arise between us, and thus strive to make contention and strikes unnecessary." This was the proper spirit, and it meets the approval of good and patriotic men everywhere. But in June, 1907, at the annual convention of that organization, this provision was stricken from the constitution, and nothing of similar or equivalent import appears therein. Is it unjust to infer from this action that conciliation, arbitration, and the maintainance of friendly relations between employer and employé are no longer among the objects of the organization, and that it proposes to favor strikes and contention? In the same constitution, prior to June, 1907, it was provided that "it shall be unlawful for any union to enter upon a strike unless ordered by three-fourths of its resident members in good standing voting. Such question shall be decided by a secret ballot at a special meeting called for that purpose." This provision was amended by the same convention so as to read as follows:

"It shall be unlawful for any union to enter upon a strike unless ordered by two-thirds of the votes cast upon the question; such question shall be decided by referendum vote at a special meeting called for that purpose."

That the ballot should be secret is no longer essential; it may be by referendum vote, and the distinction between three-quarters of all resident members in good standing voting and two-thirds of all the votes cast upon the question is also significant. These changes have rendered it much easier for a minority to declare a strike. The present strike was declared by not more than 700 votes. The same convention increased the difficulty of settling strikes by adding to the constitution this provision:

"No local union or unions of the W. F. M. shall enter into any signed contract or verbal agreement for any specified length of time with their employers."

This provision seems to provide for and render possible such a condition that the employer cannot count upon any definite period of industrial peace. Whether there shall be constant turmoil and contention must depend·upon the personnel of the men who control the action of the union. The industrial struggle between employer and employé, with occasional truces, whose length cannot be regulated by agreement with the local union, must go on until, as the preamble to the present constitution of the Western Federation of Miners says, "the producer is recognized as the sole master of his product."

Conciliation, arbitration, and the promotion of friendly relations between employer and employé, and the elimination of strikes and contention, are no longer among the declared objects of the Western Federation of Miners, and its policy seems to be to render strikes easier, settlements more difficult, and settlements by local unions for any definite period impossible. The preamble to the constitution of the Goldfield Miners' Union declares that "the working class and the employing class have nothing in common. There can be no peace so long as hunger and want are found among millions of working people, and the few, who make up the employing class, have all the good things of life. Between these two classes a struggle must go on until all the toilers * * * take and hold that which they produce by their labor." In the early part of the year 1907, a celebration was held by the Goldfield Miners' Union and "under its auspices a procession marched through the streets of that city carrying the red flag of anarchy as a sole emblem, and bearing aloft legends and mottoes of an incendiary character."

About the beginning of the strike or lockout of March, 1907, the following notice was sent to the then manager of the Goldfield Consolidated Mines Company:

"Goldfield, Nevada, March 8th, 1907.

"Mr. John W. Finch,
      "Nixon Building.

"Dear Sir: Goldfield Miners' Union No. 220, W. F. M., have passed a law that all workers employed around the mines must hold a membership card in this union, and if they do not join our members shall refuse to work. This pertains principally to carpenters. We demand that members of our organization only shall follow that work and shall draw the same wages as men now following that line of work. This goes into effect at once."

In the agreement by which that strike was settled, it was conceded that the union should have jurisdiction over all men employed in and around the mines, mills, and smelters, excepting superintendents and managers. A similar concession is to be found in each agreement recited in the record between complainant and the respondent union by which a strike was settled.

These considerations strengthen my conviction that injunctive relief is necessary. One of the most important elements to be considered in determining whether injurious conduct is to be apprehended which ought to be restrained by order of this court is the character of the dominant faction of the Goldfield Miners' Union. If that faction is animated by the spirit and the purpose exhibited in the constitutional amendments made by the Western Federation of Miners, it would be remarkable if intimidation. and coercion were not resorted to if necessary to secure "jurisdiction over all men regularly employed in and around the mines." When the spirit which prompts conciliation, arbitration, and friendly relations between employer and employé is banished, we are not far from anarchy.                          •

An injunction pendente lite will issue against all of the respondents, except C. E. Mahoney.